**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Maryland)**

| | |
|---|---|
| **Edwin Drury** | * |
| *Plaintiff,* | * |
| **v.** | * |
| **Officer P. Dziwsnowski, et al.** | * |
| *Defendant.* | *  Civil Action No.: **1:15-cv-03845-MJG** |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

<u>PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT</u>

COMES NOW, Plaintiff Edwin Drury, by and through his undersigned counsel, Anton Iamele and IAMELE & IAMELE, LLP, who hereby opposes Defendant's Motion for Summary Judgment. Plaintiff Drury contends that the defendant officers violated his constitutional rights when they entered his home on April 24, 2014 and then effected and unlawful arrest wherein they utilized unreasonable force. Plaintiff Drury asserts that summary judgment is not appropriate in this case, because (1) the Defendants officers forced their way into his home without a warrant and in the absence of any exigent circumstances; (2) arrested him without a warrant or lawful authority, and (3) utilized excessive and unreasonable force. Plaintiff states further in support of this opposition:

<u>**Contents**</u>

I.   Additional Relevant Fact and Factual Disputes ................................................................. 2

   A.   May 16, 2012 Sale of 2001 Hudson Trailer to Edwin Drury .......................................... 3

   B.   February 2014 – Purported Sale of trailer to James Bradford ......................................... 4

   C.   James Bradford's April 23, 2014 911 Calls ................................................................... 5

   D.   Bradford and Officer Dziwanowski travel to Edwin Drury' home on April 23, 2014 .... 7

   E.   Plaintiff Drury's April 23, 2014 911 Call ..................................................................... 12

   F.   April 24, 2014 – Call for service by James Bradford ..................................................... 15

   G.   April 24, 2014 arrest at 7973 Catherine Avenue ............................................................ 17

II.   Argument ............................................................................................................................. 24

III.     Conclusion ...................................................................................................................... 36

## LIST OF ATTACHED EXHIBITS

Exhibit No. 1  Affidavit of Dale Martin

Exhibit No. 2  Bill of Sale of Trailer to Edwin Drury dated May 16, 2012

Exhibit No. 3  Deposition of James Bradford

Exhibit No. 4  CAD Record for James Bradford's 911 Call on April 23, 2014 CAD at 7:12PM

Exhibit No. 5  Transcript of James Bradford 911 Call Number 1

Exhibit No. 6  CAD Record for James Bradford's 911 Call on April 23, 2014 at 8:01PM

Exhibit No. 7  Transcript of James Bradford 911 Call Number 2

Exhibit No. 8  Deposition of Corporal Paul Matthew Dziwanowski

Exhibit No. 9  Deposition of Edwin Drury, Jr.

Exhibit No. 10 CAD Record for Edwin Drury, Jr.'s 911 Call on April 23, 2014 at 9:05PM

Exhibit No. 11 Transcript of Edwin Drury, Jr.'s April 23, 2014 911 Call

Exhibit No. 12 Deposition of Laura VanAntwerp

Exhibit No. 13 CAD Record for April 24, 2014 911 Call

Exhibit No. 14 Deposition of Edwin Drury, III

Exhibit No. 15 Anne Arundel County Police Department Report Authored by Corporal Hicks

Exhibit No. 16 Deposition of Corporal William E. Sinclair Hicks

Exhibit No. 17 Application for Statement of Charges

Exhibit No. 18 Statement of Probable Cause

Exhibit No. 19 Edwin Drury, Jr.'s Baltimore Washington Medical Center Medical Records

## I.     Additional Relevant Fact and Factual Disputes

For purposes of the instant opposition, Plaintiff Drury has enhanced and ordered the

factual record. Plaintiff specifically asserts that some of all of the factual information explained

the by Defendants' in numbers factual averments 20, 29, 34, 42, 43, 44, 47, 48, 50, 51, and 52-54 is subject to dispute. The dispute of fact is borne out through a consideration of additional evidentiary materials in the factual record set forth below.

### A.    May 16, 2012 Sale of 2001 Hudson Trailer to Edwin Drury

In March of 2002, Bradford West and his wife and Dale West (now "Dale Martin") collectively purchased the 2001 Hudson trailer described in Plaintiff's Compliant. (Attached Exhibit No. 1, Affidavit of Dale Martin and Appended Documents) In July of 2011, Bradford West initiated a divorce proceeding styled *Bradford West v. Dale West,* Anne Arundel County Circuit Court Case No. 02-C-11-162366. (*Id.*) The Hudson trailer was included among a number of items designated as marital property subject to dissolution. (*Id.*)

On May 16, 2012, while the divorce action was pending, Ms. Martin sold the Hudson trailer to Plaintiff Drury. (*Id.*) At the time of the sale, Ms. Martin generated a Bill of Sale that she (using her married name "Dale West") and Plaintiff Drury both signed. (*Id.*; Attached Exhibit No. 2, "Bill of Sale" dated May 16, 2012) Ms. Martin then forwarded the Hudson trailer's title to Bradford West, through divorce counsel, so that the former could execute the document for purpose of finalizing the sale. (Attached Exhibit1)  Ms. Martin suggested that Plaintiff Drury leave the Hudson trailer behind her residence located at 8257 New Cut Road while this process was underway. (*Id.*) Plaintiff Drury acquiesced; Ms. Martin would ultimately maintain the trailer under lock at New Cut Road residence until she allowed it to be transferred until April of 2014. (*Id.*)

On June 28, 2012, Judge J. Michael Wachs issued a Judgment of Absolute Divorce in *West v. West,* Case No. 02-C-11-162366. (*Id.*) Bradford West was remarried to a woman named Cathy Jo and passed away within ninety days of the final divorce decree. (*Id.*) At the time of Bradford West's death on September 12, 2012, Ms. Martin had possession of the Hudson trailer.

(*Id*.) Ms. Martin contacted Cathy Jo West and requested that the title to the trailer be returned to her attention. (*Id*.)  On March 18, 2013, Cathy Jo West advised Ms. Martin she intended to have the trailer re-titled in her name. (*Id*.)  That same day, Ms. Martin responded to Cathy Jo west with an e-mail communication in which she explained that the latter had no ownership rights in the trailer.  (*Id*.)  Ms. Martin maintained possession of the trailer thereafter.

In late April of 2014, Ms. Martin contacted Plaintiff Drury and advised him to have the trailer transported from her property at 8257 New Cut Road. (*Id*.) At the time, she believed that foreclosure was imminent and was concerned that she would not have future access to the property.  (*Id*.) Ms. Martin subsequently facilitated removal of the trailer.  (*Id*.)

### B.    February 2014 – Purported Sale of trailer to James Bradford
James Bradford works as a Correctional Officer at the Ordinance Road Correctional Facility for Anne Arundel County and also operates a part time snow removal business. (Attached Exhibit No. 3, Deposition of James Bradford, p. 7-8). In approximately February of 2014, Mr. Bradford approached Cathy Jo West after learning "through mutual friends" that she had a trailer for sale. (*Id.*, pp. 15-17)  Cathy Jo West did not have possession of the trailer she was attempting to sell and could not produce it for physical inspection. (*Id.*, pp. 17-19)   She explained to Mr. Bradford that this "weird situation" arose because it had been her "husband's trailer, he went through a divorce, but it was in her name…." (*Id.*, p. 17-18) Mr. Bradford subsequently paid Cathy Jo West to purchase the trailer stored "behind" a house where Bradford West's "ex-wife [was] residing". (*Id.*, pp. 16-20) At the time of the transaction, Cathy Jo West indicated that she would "try and work something out so [he] could get access on the BG&E property through [Dale Martin's] driveway" to the trailer, but anticipated "there would probably be some conflict."  (*Id.*, pp. 16-20, 27-28)  Mr. Bradford and Cathy Jo West did not reach any agreement as to when he would obtain possession of the trailer. (*Id.*, p. 20)

Mr. Bradford never traveled to 8257 New Cut Road in attempt to pick up the trailer. (*Id.*, pp. 31-33). He also did not speak with Dale Martin in an attempt to gain access to the trailer. (*Id.*, pp. 31-33) His efforts to obtain the trailer were limited to a single conversation with Cathy Jo West during which she claimed to have contacted Dale Martin but indicated that it "didn't go well." (*Id.*, pp. 28-29; 32-34)   Dale Martin denies that Cathy Jo West ever contacted her or reported that she had attempted to sell the trailer to Mr. Bradford. (Attached Exhibit No. 1) Mr. Bradford never obtained or had possession of the trailer. (Motion for Summary Judgment, p. 8, para. 5; Exhibit No. 3, pp. 19-20, 34-35)

> **C.** **James Bradford's April 23, 2014 911 Calls**

On or about April 23, 2014, Mr. Bradford received a call from a "neighbor" of Dale Martin who witnessed a "small dump truck or something that picked [up the trailer], hooked up to it and pulled it out of there." (Exhibit No. 3, pp. 42-43) Mr. Bradford did not personally observe any portion of this occurrence. (*Id.*, pp. 42-43) The individual who witnessed the trailer being moved apparently observed that the truck was marked "High Noon Paving". (*Id.*, pp. 44-45) However, he or she was not able to provide any identification or description of the person who had been driving the truck. (*Id.*, p. 44, 47-48)

Mr. Bradford managed to obtain a telephone number for High Noon Paving and called the business the same day. (*Id.*, pp. 40-41, 45) He subsequently spoke with an individual that he "didn't know who it was, but it was apparently the guy that took the trailer." (*Id.*, p. 41) The unknown person to whom Mr. Bradford was speaking indicated that he had purchased the trailer. (*Id.*, p. 40-42, 46, 56-57, 63)   According to Mr. Bradford, this is the only conversation that he may have had with the person who was subsequently identified as Edwin Drury. (*Id.*, p. 44, 48)

Later in the day on April 23, 2014, at approximately 7:12 pm, Mr. Bradford called Anne Arundel County 911 dispatch.  (Attached Exhibit No. 4, April 23, 2014 CAD record)   Mr.

Bradford made the following report to the 911 dispatcher:

> Oh, I have a piece of property, a piece of construction equipment, equipment trailer, that was on a piece of property in Mllersville. I bought it from the rightful owner. However, the previous person was holding it hostage on the property and wouldn't allow anybody to trespass on the property to acquire it. Well, she knew it wasn't hers and she apparently sold it, and I have all the information of where she put it to and I'm heading over there now….

(Exhibit No. 5, Transcript of Bradford 911 Call Number 1, p. 2) Mr. Bradford further indicated that he had title to the trailer, explained some of the circumstances surrounding the sales, and indicated that trailer was "supposed to be" at 7973 Catherine Avenue. (*Id.*, pp. 2-5) The Anne Arundel County dispatcher advised Mr. Bradford that the dispute he was describing was a "civil matter because of the property involved" and stated further that "the only thing an officer is gonna be able to do is intercept if there's dispute in between [Mr. Bradford and the person at the stated address]." (*Id.*, p. 4) The dispatcher also asked Mr. Bradford if the trailer had "been reported stolen" and he responded in the negative. (*Id.*, p. 6) Mr. Bradford requested that an officer be dispatched to meet him. (*Id.*, p. 6)

At 8:01 pm, Mr. Bradford called Anne Arundel County dispatch a second time. (Exhibit No. 6, April 23, 2014 CAD record) Upon questioning about the nature of the call, Mr. Bradford explained:

> It's in reference to me picking up stolen property that was stolen from a resid[ence] that I have a tag and title for that is now no longer on that property, and the person sold it illegally to someone.

(Exhibit No. 7, Transcript of Bradford 4/23/2014 911 Call Number 2, p. 2) Upon further questioning by the 911 operator, Mr. Bradford acknowledged that he "rode by [the location where he believed the trailer had been transported] and the trailer is not there…." (Exhibit No. 7, p. 3) Mr. Bradford again requested that an officer meet him at the Royal Farm Store.

**D.  Bradford and Officer Dziwanowski travel to Edwin Drury' home on April 23, 2014**

Officer Dziwanowski responded to Mr. Bradford's 911 calls and arrived at the Royal Farms store at 8:23 pm. Mr. Bradford advised Officer Dziwanowksi that he had purchased a trailer in February of 2014 but had never had it in his possession since that time. (Attached Exhibit No. 8, Deposition of Cpl. Paul Mathew Dziwanowski, pp. 246-247, 128-129) Mr. Bradford attributed his inability to gain access to the trailer to "some sort of a dispute between a wife and an ex wife" (*Id.*, pp 122-123) According to Cpl. Dziwanowksi:

> [Mr. Bradford] explains that he had purchased – just – he explained that he purchased the trailer. He had been attempting to retrieve the trailer from a property, the owner of the property wouldn't allow him access to it.
>
> He had since gone out and gotten a tag, title, and registration card for this trailer. When he has made several attempts to go over and pick up the trailer, the property owner was not allowing him access to the property, to get the trailer.
>
> He said he went to check on it one day, it was there; the next day, it was gone. He made some inquiries and found out that a vehicle with High Noon Paving on it had gone and picked it up – went over to pick up the trailer and had taken it off the property.
>
> Mr. Bradford said he did some research, he found out where High Noon Paving came back to, an address on Catherine Avenue, and he wanted me to go over with him and try to get his trailer back.

(*Id.*, pp. 118-119) Mr. Bradford advised Cpl. Dziwanowlsi, in a manner consistent with both 911 calls, of his belief that the trailer had been sold by the owner of the Millersville property. (Exhibit No. 3, pp 47-50) Mr. Bradford had contacted an unknown male by way of the High Noon Paving telephone who stated he purchased the trailer. (Exhibit No. 3, pp. 49-50, 57)

Mr. Bradford and Cpl. Dziwanowski traveled to 7379 Catherine Avenue. (Exhibit No. 3, p. 50)  At the time of their arrival, no trailer was present at the location and no vehicles marked "High Noon Paving" were parked at or near the location. (Exhibit No. 3, p. 51; Exhibit 8, p. 129) The only person who was present in the home was "an older lady" that Mr. Bradford "assumed

lived there." (Exhibit No. 3, p. 52)  Officer Dziwanowski knocked on the door and spoke with

this woman who he cannot identify but now "guess[es] it was Drury's wife." (Exhibit No. 8, p.

128)  Mr. Drury "wasn't there." (Exhibit No. 8, p. 131)  Cpl. Dziwanowski "asked her if [she]

could get a hold of [Mr. Drury]" and "[s]he called him" on a cell phone.  (Exhibit No. 8, p. 131)

During the ensuing telephone conversation, Mr. Drury advised Cpl. Dziwanowksi that

"he bought the trailer from Dale West for $2500" and had a corresponding bill of sale. (Exhibit

No. 8, p. 133)  Cpl. Dziwanowksi has described the conversation as follows:

> I explained who I… I listened to his side…. I told him I
> understand that he's out $2500 or however much he spent on the
> trailer. However, that was an issue between him and Dale West to
> take to court.
> I said – I told him the trailer belonged to Mr. Bradford. I
> told him I would give him Mr. Bradford's information and
> hopefully those two could work it out, and I told him that if [they]
> could not work it out amongst themselves, that he would be
> charged with theft.

(*Id.*, p. 132) Cpl. Dziwanowksi provided Mr. Bradford with "Mr. Drury's information" and

directed him to "Get in contact with him, try to work it out…." (*Id.*, p. 152)  There was "no set

time" within which this process was to occur;

> Mr. Bradford came to an agreement that he would give Mr. Drury
> time for them to sort this out amongst themselves, and if he
> couldn't, then he would – was to call [the Anne Arundel County
> Police Department] back and [officers] would prepare a report for
> him then.

(*Id.*, pp. 150, 152)

Cpl. Dziwanowski simultaneously directed Mr. Drury to tender the trailer to Mr.

Bradford (*Id.*, p. 136). The rational for this directive was illuminated at deposition:

> Q. … You believed that that was a matter which you could make a
> determination about property rights?
>
> A. Correct.

Q. And you elected at that point to issue a directive to Mr. Drury to tender the trailer to Mr. Bradford.

A. Correct.

Q. … And was that directive and your decision to issue that directive based on any training that you received, either before or during the course of your employment with the Anne Arundel Police Department?

A. It was based off of criminal law, so yes.

Q. Okay. And what in particular – which portion of the criminal law article?

A. The one dealing with theft.

Q. Okay. Can you identify it for me?

A. No.

*          *          *

Q. …[You are indicating to me] that you have the authority to make a pronouncement about the ownership rights of property, and you're indicating to me that your authority to make that pronouncement is based on the criminal law. I'm with you so far, correct?

A. Correct.

*          *          *

Q. On April 23, 2014, when you have your telephone conversation with Mr. Drury, you believe that you had the authority to make the directive to him, or a command, or order, or whatever you want to call it, that he should give a trailer that he said he purchased to Mr. Bradford, correct?

A. Correct.

*          *          *

Q. Okay. Now my question to you, sir, is which provision in the criminal law article gives you that authority to make that directive, command, or order?

A. At that point, I believed that probable cause existed that Mr.

> Drury had a piece of property that belonged to Mr. Bradford, and I was giving them an opportunity to work it out without charges being placed, with them being civil with each other, in order to rectify this situation.

(Exhibit 8, pp. 136-141)

Cpl. Dziwanowski offered this directive without conducting an investigation. By his own admission, Cpl. Dziwanowski had not been to Dale Martin's property (Exhibit No. 8, p. 125), and did not undertake any efforts to determine how or why the trailer came to be on her property. (*Id.*, p. 130) He also did not speak with Dale Martin or Cathy Jo West regarding the matter. (*Id.*, pp. 80, 125-126, 168) He did not inquire, and had no concept of, when in time Dale Martin or Cathy Jo West had possession of the trailer, the sale reported by Mr. Drury had occurred, or the title displayed by Mr. Bradford had issued. (*Id.*, p. 133-134; 254-257) He never contacted the person who reportedly witnessed the trailer being transported away from Dale Martin's property. (*Id.*, p. 144) Finally, Cpl. Dziwanowksi did not query Mr. Drury about the VIN (serial number) of the trailer that had been picked up by High Noon Paving, nor did he request a description of any particular marking on the vehicle. (*Id.*, pp. 147-148)

In the absence of any investigation on April 23, 2014, Cpl. Dziwanowksi could not act to verify or otherwise confirm that title displayed by Mr. Bradford identified the same trailer that had been picked up by High Noon Paving. Cpl. Dziwanowksi had not observed the trailer at Dale Martin's property (Exhibit No. 8, p. 123) and never had occasion to see the trailer at Mr. Drury's residence after it was reportedly moved. (*Id.*, p. 128) Cpl. Dziwanowski had not witnessed Mr. Drury moving the trailer, nor had he seen the trailer hitched to Mr. Drury's vehicle. (*Id.*, pp. 142-144)    In fact, he never personally observed any trailer or inspected any trailer VIN (serial number) of in the context of this case. (*Id.*, pp. 76, 147-148)   This evidentiary deficit was addressed at deposition:

Q. … What was your process of determining that the trailer that Mr. Bradford was laying claim to was the same trailer that Mr. Drury had picked up; how did you make that determination?

A. Mr. Bradford had gone over to pick up the trailer form the same location that the High Noon Paving truck was apparently seen picking the trailer up from. Mr. Drury said he just got the trailer from Dale West, whose property it was the trailer was sitting on.

Q. Well, how many trailers were there?

A. According to Google Earth, one.

Q. Okay. And you looked at Google Earth that date?

A. Not that day.

Q. Okay. And the Google Earth photograph is dated for what day?

A. Don't know.

Q. All right. And what if any traffic had moved on or off Dale West Martin's property between the time of the Google Earth photograph and the time that the trailer was picked up?

A. I don't know. Mr. Bradford said, This is my trailer, it's on this property. Here it is, it's in the area he described, on her property.

                    *              *              *

Q. .. The question to you, sir, is, what did you do, okay, what were your efforts to verify that the trailer that Mr. Bradford was laying claim to was the same trailer that allegedly had been picked up by Mr. Drury from the property?

A. He told me it was the trailer that he was --- been trying to pick up for a few months.

Q. All right. Other than him telling you that, you didn't undertake any other efforts?

A. I never was able to see the trailer. I can't see something that isn't there.

Q. Did it ever dawn on you that these gentlemen may be talking about different trailers?

A. No.

(Exhibit 8, pp. 145-147) Cpl. Dziwanowski reasoned: "Without actually seeing it, I don't know it was the same trailer, but it… has to be the same trailer." (*Id.*, pp. 263-264)

Following the telephone conversation with Mr. Drury, Cpl. Dziwanowski told Mr. Bradford that "he would follow up and try to make contact later at another time when the fellow was home…" (Exhibit No. 3, p. 54), and indicated that the situation would "probably turn into a civil matter…" (*Id.*, pp. 68-69) Cpl. Dziwanowki's call for service to 7973 Catherine Avenue and initial involvement with the case was marked closed at 8:50 pm on April 23, 2013. (Exhibit 6; Exhibit 8, pp. 149-150) Cpl. Dziwanowski did not generate any report concerning the call for service by Mr. Bradford or his conversation with Mr. Drury. (Attached Exhibit 8, p. 34) Because Anne Arundel Police Department protocol requires that Cpl. Dziwanowski make a written report when he believes that a crime had been committed (Attached *Id.*, p. 31), his decision not to generate such any report on April 23, 2014 is dispositive of his assertion, in the instant litigation, that he had probable cause to believe Mr. Drury had committed a theft.

### E. Plaintiff Drury's April 23, 2014 911 Call

Mr. Drury recalls a few substantive differences concerning the telephone conversation he had with Cpl. Dziwanowski. He explained at deposition:

> [Cpl. Dziwanowski] said Mr. Drury you stole a trailer today. I said stole a trailer. I said I purchased trailer and I said I have a bill of sale. I said why? He goes I have the person here that has the title, has this and this to it. I said well, who is this person" Quote, I'm not at liberty to tell you that. So I said, okay, well, tell him to take me to court and we will find out whose trailer it is.
>             \*           \*           \*
> [Cpl. Dziwanowski] said I'm going to give you a couple of days to give it back. I said I got a bill of sale, I didn't steal it.

(Attached Exhibit No. 9, Deposition of Edwin Drury, pp 42-43)

Mr. Drury, who had only spoken with Cpl. Dziwanowski by phone, was never shown

copies of the title, registration of tags that Mr. Bradford (who was then unknown to him) relied upon in support of his claim of an ownership interest in the trailer. (Exhibit No. 8. pp. 152-153, 222) Officer Dziwanowksi maintains that he "told [Mr. Drury] over the phone that these items existed" and that the latter should have accepted this report as proof of an ownership interest because: "If you have a police officer standing there, why would you – what else would you need?" (*Id.,* p. 153; Exhibit 8, pp. 265-267) There is no legal obligation, however, for Mr. Drury to accept the veracity of such assertions during the telephone call. Mr. Drury had no basis to know that a trailer, which had been locked on Dale Martin's property for in excess of two years, could have been the subject of separate transaction with Mr. Bradford.

Mr. Drury explained his confusion at deposition:

> Q [Cpl. Dziwanowksi] said I'm going to give you a couple of days to give it back?
>
> A Yes.
>
> Q Did he say what would happen if you didn't give it back?
>
> A I don't really recall that, honest.
>
> Q What do you think he meant, I'm going to give you a couple of days to give it back?
>
> A I guess to sort things out. I don't know what it was even about, I was so upset. I went right home, I went right home and I dialed 911. I requested him back to my house.
>
> Q Why?
>
> A To find out what's going on.

(Attached Exhibit No. 9, pp. 43-44) Mr. Drury intended to display the bill of sale that he had obtained in conjunction with the trailer purchase to the officers at his home. (*Id.*, pp 44-54)

On April 23, 2014, at approximately 9:05 pm, Mr. Drury placed a 911 call to Anne

Arundel County. (Attached Exhibit No. 10. CAD Report Notes for Police Info 7973 Catherine Avenue) This call was placed fifteen minutes after Cpl. Dziwanowski left the Drury residence. (Exhibit 8, p, 155) Mr. Drury explained to dispatcher:

> … It's no emergency thing. An officer was just at my house.
>
> And I need to have that officer get returned here. He had some information or something that they were discussing with me over the phone, but they left no number, no nothing, about something that I bought and they said I [stole] it, I didn't because I just talked to the lady. I need – I need the officer who's got the information of the person that was with him, and this is 7973 Catherine Avenue. Could you maybe have that officer – officer return here, please.
>
> \*                    \*                    \*
>
> … I need the officer because he had the guy or the guy had him come with him or whatever, I don't know. I don't know the guy's name, so I gotta get all that information so that I wanna call the lady back that I bought the [trailer] from so that she can decipher what's going on.

(Attached Exhibit No. 11, Transcript of Drury April 23, 2014 911 Call) The dispatcher indicated that officers would be directed to "meet [Mr. Drury] back at the house." (Exhibit No. 11)

Cpl. Dziwanowksi, whose next call for service did not occur until 9:50 pm on the same evening, does not have any recollection of Mr. Drury's call for service. (Exhibit 8, p 155-156) At deposition, he indicated that he "may not have herd" it. (*Id.*, p 156) He did not respond to the call. (Exhibit No 10)

Anne Arundel County Police Officer Laura VanAntwerp arrived at Mr. Drury's home in response to his call for service. (Exhibit No. 10) Mr. Drury met her outside of his home with a copy of the bill of sale for the trailer; and explained the happenings as follows:

> … I went look, here's the bill of sale, where's the officer that was here, you know Waski (phonetic) or Dziwanowski. I said where's he at so I can show him this that I didn't steal a trailer. She goes, looks at it, we don't get involved in this, this is a civil matter.

(Exhibit No. 9, pp. 47-48) He explained further:

> Q …And so that officer who came on the evening of the 23rd was a female officer?
>
> A Yes, sir.
>
> Q And she looked at the bill of sale?
>
> A Yes.
>
> Q And she said it's a civil matter?
>
> A We don't get involved in this stuff, it's a civil matter.
>
> Q Did you tell her the first officer had accused you of a criminal theft?
>
> A Yeah, I told her….

(Exhibit No. 9, p. 51) Officer VanAntwerp confirmed that she cleared the call after explaining to Mr. Drury that the reported trailer dispute was a "civil matter." (Attached Exhibit No. 12, Deposition of Laura VanAntwerp, p. 50) Following this interaction, Mr. Drury was not concerned that he might be arrested because he "had a bill of sale" and had been advised that the dispute was a civil matter. (Exhibit No. 9, p. 59) He went to bed and the next day he went to work. (*Id.*, p. 55) Cpl. Dziwanoswki can neither confirm nor deny knowledge of Officer VanAntwerp's Aprl 23, 2014 response to the Drury residence. (Exhibit No. 8, pp. 159-160)

**F.      April 24, 2014 – Call for service by James Bradford**

On April 24, 2014, Mr. Bradford apparently called the Anne Arundel County Police Department regarding the trailer. There is no 911 recording corresponding with this call. However, a Computer Aided Disptach (CAD) record includes a transmission concerning a 4:06 pm call stating as follows: "Caller [advised] someone sold a trailer who did not have authority to sell it. Has already spoken with #1588 in [reference]. Has information of who currently has the

trailer, as well as who sold it. No further information." (Attached Exhibit No. 13, April 24, 2014 CAD Report) Cpl. Dziwanowski indicated familiarity with the situation and responded to the call. (Exhibit No. 8, p. 163-164)

According to Cpl. Dziwanowski, his response included travel to Mr. Bradford's residence at 506 Likeston Court. (Exhibit No. 8, p. 165) He claims that Mr. Bradford advised him at the residence that "Mr. Drury said he was not willing to relinquish the trailer, and that he was going to destroy it."  (*Id.*, p. 165) Mr. Bradford does not, however, have any recollection of police coming to his home that day and "thinks" his only communication with police was by way of e-mail (Exhibit No. 3, pp. 63-64) Mr. Bradford also does not have any recollection of Mr. Drury stating that he was going to destroy the trailer. (Exhibit No. 3, p. 76) There are notations on the CAD record indicating that Cpl. Dziwanowski reported that he was traveling to or had arrived at Mr. Bradford's Likeston Court address. (Exhibit 13)

Cpl. Dziwanowksi claims to have had sufficient information following his communication with Mr. Bradford on to obtain a warrant.  (Exhibit No. 8, p. 166) He did not undertake the "relatively simple" process of obtaining a warrant that is required when an alleged crime is "not covered under the specified misdemeanors or [the crime] hasn't been committed in [his] presence."  (*Id.*, pp. 34-38) Cpl. Dziwanowski explained his decision against getting a warrant as follows: "Theft is a specified misdemeanor; I don't need a warrant."  (*Id.*, p. 166-167)

Cpl. Dziwanowksi did not intend to arrest Mr. Drury following his communication with Mr. Bradford and before he traveled to Catherine Avenue. This was addressed at deposition:

> Q All right. And so your purpose once you leave Likeston Court is to go arrest Mr. Drury.
>
> A No.
>
> Q What is your purpose?

A To go speak with Mr. Drury?

Q Okay.

A And try to continue to work this out.

Q And the conversation's going to be what?

A We need to get this trailer matter resolved, we need to get this trailer back to him. I understand that you're out your cash. Same thing I told him the day before on the phone, and if he is willing to relinquish the trailer there, there would be no need to arrest him at that point, I wouldn't apply for charges then, because he's being cooperative, and I'm trying to treat him with respect.

(Exhibit No. 8, p. 167-168)

### G. April 24, 2014 arrest at 7973 Catherine Avenue

Cpl. Dziwanowski set about traveling to 7973 Catherine Avenue at 5:22 pm, approximately one hour and fifteen minutes after Mr. Bradford's call for service. (Exhibit No. 13, Exhibit No. 8, p. 164) While in route he received a call from Cpl. Hicks, and it was agreed that they would meet at the Drury residence to discuss a problem the latter was having with his computer. (Exhibit No. 8, p. 170-171) The CAD record indicates that Cpl. Dziwanowski reported his arrival to the Catherine Avenue property at 5:42 and that Cpl. Hicks reported arrival two minutes later. (Exhibit 13) Cpl. Dziwanowski fixed the computer, advised Cpl. Hicks they were there "to speak with Mr. Drury about this trailer", and then explained: "If Mr. Drury is willing to relinquish the trailer, we're going to be out of here; if not we're going to arrest him." (Exhibit No. 8, pp. 173-174)

At or about that time, Edwin Drury, III (Plaintiff's son) arrived home and witnessed two police officers standing next to patrol cars parked on 221st Street by Catherine Avenue. (Exhibit No. 14, Deposition of Edwin Drury, III, pp. 11-13). One of the officers asked the younger Mr. Dury where "Edwin Drury was" to which he replied "which one?" (*Id.*, p. 13) The officers told

him "don't be a smart ass" before they realized there were multiple people at the residence named Edwin Drury and clarifying that they were looking for his father. (*Id.*) The officers also mentioned a trailer, but the younger Mr. Drury "had no clue what they were talking about" and no trailer was present at the property. (*Id.*, p. 16)   The younger Mr. Drury went inside and advised his father, who "was getting out of the shower", "there's two cops outside looking for you." (*Id.*, p. 14; Exhibit 9, p. 63)

Plaintiff Drury observed the officers allowing themselves into an enclosed porch room area of his home. (Exhibit 9, p. 67) Mr. Drury explained:

> I have a room in front of my house, glassed, all closed, locked, heated, air conditioned, part of the room, furniture and all. They entered that part, and I have a plated glass door with all panes in it, and I saw them come in because the blinds were open, and I said I'll be with you in a moment.

(Exhibit 9, p. 67, continuing explanation Exhibit 9, pp. 68-71)

Mr. Drury opened an inner door "halfway" to speak with officers but did not step through the threshold into the enclosed porch area.  (Exhibit 9, pp. 71-72) Upon opening the door, the officers asked Mr. Drury "Where's the trailer?" to which he responded "a friend of mine is putting boards on it." (*Id.*, p. 72) The officers did not request the identity of the friend who had possession of the trailer. (*Id.*, p. 72)   Mr. Drury displayed a copy of the bill of sale to Cpl. Dziwanowksi and Hicks. (Exhibit 15, Report of Cpl. Hicks; Exhibit No. 8, pp. 177-178) Cpl. Dziwanowksi, who admittedly did not have a warrant, did not suggest to Mr. Drury that he had a warrant, order or judicial decree compelling Mr. Drury to produce the trailer to Mr. Bradford. (Exhibit 8, p. 185)   The officers nevertheless said "we want the trailer", and Mr. Drury responded that he would turn over the trailer if the purchase money was returned to him. (Exhibit No. 9, pp.  73-74) Cpl. Dziwanowski subsequently "asked [Mr. Drury] to come out on [his]

porch", and Mr. Drury "said no" because "[he] was done talking to them." (*Id.*, p. 74-76; Exhibit 15)

During the course of his deposition, Mr. Drury was asked whether he was "concerned that [he was] about to be arrested" at that point in time. He responded:

> That didn't enter my mind. I was, you know, like it didn't enter my mind, get arrested. For what? What was I going to, in my mind, what was I going to be arrested for? I didn't do anything wrong, and I was done talking to them, and I went to close the door.

(Exhibit 9, p. 76; see also Exhibit 15) Mr. Drury's belief persisted in good faith because neither of the defendant officers communicated to Mr. Drury that he was subject to arrest. (Attached Exhibit 16, Deposition of Cpl. Hicks, pp. 40-41) This was addressed during the course of Cpl. Dziwanowski's deposition as follows:

> Q Okay. When you told Mr. Dury to step out onto the porch, did you say, Hey, you're under arrest, step out onto the porch?
>
> A I didn't get to that point.
>
> Q Okay. So he didn't know you were trying to arrest him at that point?
>
> A I said "Step out." He began immediately retreating back inside.
>
>         *             *             *
>
> Q. But prior to that point where he was retreating into the house, you did not tell Mr. Drury that he was under arrest.
>
> A No.

(Exhibit No. 8, pp. 181-182, p. 219) .

Cpl. Dziwanowksi decided to arrest "based on his lack of cooperation with [Cpl. Dziwanoski]" in not disclosing the whereabouts of the trailer, and not because of the alleged theft. (Exhibit 8, pp. 188-189) Cpl. Dziwanowski more thoroughly explained the perceived lack of cooperation underpinning the arrest at deposition:

Q. Okay. And according to your earlier testimony, when you first went there, your purpose was not to arrest Mr. Drury?

A The purpose was to speak to Mr. Drury.

Q Right. So something happened, after the time of your arrival and before you went into the house, that prompted you to make a decision to arrest him?

A I gave him one last effort.

Q And the last effort was, Tell me where the trailer is –

A Yeah, I asked him where the trailer is.

Q – and if you don't tell me where the trailer is, or else, basically?

A We didn't have a choice at that point.

Q But you didn't tell him that; you just said tell me where the trailer is.

A I told him that on the phone the day before.

Q Well, you told me earlier you told him on the phone the day before, that you said, Give the trailer to Bradford in an unspecified time.

A I gave them each other's information to work it out. I was trying to avoid being in the middle of that.

Q Okay. Now the next day, you are back over there, and –

A Right.

Q – you're at the doorway, [Mr. Drury is] showing you [the bill of sale], and something happened that prompts the arrest?

A His refusal to cooperate.

Q And the refusal to cooperate is not telling you where the trailer is?

A Correct.

Q Okay. Now do you agree with me, sir, and am I correct that Mr.

> Drury was in the process of closing his door as you pushed your way into the home?
>
> A I held my hand up to keep the door from shutting on us.

(Exhibit No. 8, pp. 192-193)

Cpl. Dziwanowksi and Cpl. Hicks then "physically" "pushed the door open and made entry into the residence." (Exhibit 16, p. 55) Mr. Drury described them "like Army men busting in somewhere", and explained the door "swung all the way open, bent the doorknob, blew the glass out, [and] blew the glass out of the painted mirror behind it." (Exhibit 9, p. 77) After the officers had forced their way into Mr. Drury's home, "[Mr. Drury] retreated across the room at sat down on the couch." (Exhibit No. 8, p. 195) Cpl. Dziwanowski has conceded that Mr. Drury was not overtly resisting them in any fashion at that point in time, but "kept saying that [the officers] needed a warrant." (Exhibit No. 8, p. 195) Cpl. Hicks described the happenings as follows: "Mr. Drury was screaming that we couldn't be in his house and when I went to grab his arm to handcuff him, Mr. Drury sat down on a couch." (Exhibit No. 15)

Edwin Drury, III, "ran up from the basement after hearing the crash noise" and observed his father "actually on the couch at that time, like almost, almost in a seated position on the couch with two officers pulling at each arm." (Exhibit No. 14, p. 20) The younger Mr. Drury did not hear the officers giving his father any verbal commands to stand up or place his arms behind his back, and also did not hear any indication that he was being placed under arrest. (*Id.*, pp. 21, 25-26) The officers lifted Mr. Drury off of that couch at which point Cpl. Dziwanowski was standing on his left side holding his left arm and Cpl. Hicks began the process of placing a handcuff on his right wrist. (Exhibit No. 9, pp. 94-95) Mr. Drury explained that at that point "One of them did slam me to the floor. I don't know which one."(*Id.*, p. 98-99) The younger Mr. Drury explained that the officers "got [his father] off of the couch" (Exhibit 14, p. 21) and then

"[his] father had gotten spun around, and as he spun around, and they all three had pretty much started to go the ground, and [his] father had went head first with his hands to the side and behind the back into the front of the couch…." (*Id.*, pp. 22-23) He stated that the sequence of getting Mr. Drury off the couch onto the ground spanned "Ten seconds, maybe." (*Id.*, p. 34)

Mr. Drury ended up on the floor with his "face under the couch." (Exhibit 9, p. 99) His right arm was being held "straight out behind [him], and [his] left arm was under [his] belly." (*Id.*, p. 100) Mr. Drury felt someone "twisting the heck out of" his right wrist. (*Id.*, p. 100) The younger Mr. Drury explained that Mr. Drury was effectively restrained on the ground:

> Q At that time you saw your father face down on the ground and Cpl. Hicks to his right on his feet holding on to [you father's] arm, where was Cpl. Dziwanowski?
>
> A On the other side, and he was on the ground down, and his left hand, I don't know if it was on the neck or the back of his head or his shoulder, but his left hand was planted, and his right hand was on his left arm, my father's left arm, and the kneeing, and he was putting knees into my father's side.

(Exhibit 14, p. 36) According to the younger Mr. Drury, Cpl. Dziwanowksi was "intentionally striking" his father by "slamming [his] knee into the side" of Mr. Drury's body. (*Id.*, pp. 39-40) After Cpl. Dziwanowski "kneed [Mr. Drury] about four times, [he] said man, you broke my ribs." (Exhibit 9, p. 102) Cpl. Dziwanowski then "raised his left arm and started punching and slamming his forearm down" onto his Mr. Drury's left flank and back. (Exhibit 14, pp. 37-38) All of the strikes occurred while Mr. Drury was being held face down on the ground with his arm pulled behind his back. (*Id.*, p. 40-41)

Mr. Drury was subsequently arrested. Cpl. Dziwanowksi completed a "Statement of Charges" requesting to have Mr. Drury charged with four misdemeanor crimes; namely, Theft less than $1000, Second Degree Assault, Resisting Lawful Arrest, and Unauthorized Removal of

Property. (Exhibit No. 8, pp. 223-224; Exhibit No. 17, Application for Statement of Charges)

Cpl. Dziwanowski also authored a Statement of Probable Cause in support of the charges. (Exhibit 18, Statement of Probable Cause) Within this three page document he distorted certain critical facts regarding his interaction with Mr. Drury. Cpl. Dziwanowski wholly omitted the fact that Mr. Dury had produced a bill of sale corresponding with his purchase of the trailer. (*Id.*) He also indicated that "Mr. Bradford agreed to give Mr. Drury a day to get the trailer returned to him. (*Id.*) As noted herein, however, Cpl. Dziwanowksi conceded that no specific time period was communicated to Mr. Drury for the ordered "return" of the trailer on April 23, 2014, and Mr. Drury had never been provided with any proof that Mr. Bradford had obtained title to the trailer prior to the time of his April 24, 2014 arrest.

Cpl. Dziwanowski further embellished his account of the physical happenings to create the appearance that Mr. Drury had acted to intentionally assault him and resist arrest and thereby justify the use of force. Cpl. Dziwanowksi described the happenings as follows:

> We were able to get Mr. Drury to stand up but he refused to put his hands behind his back. Mr. Drury swung his left fist towards my head in an attempt to punch me but missed. Mr. Drury shoved my head into a piece of furniture that was nearby. I grabbed Mr. Drury around his head to take him to the ground. As I grabbed his head Mr. Drury put his open mouth on my left forearm. I believed Mr. Drury was going to bite me…

(*Id.*) The younger Mr. Drury denies that his father attempted to strike Cpl. Dziwanowski. (Exhibit 14, pp. 26, 35) Mr. Drury also denies that he attempted to strike Cpl. Dziwanowski. (Exhibit 9, p. 106) At deposition, Cpl. Hicks explained that when he and Cpl. Dziwanowski pulled Mr. Drury off of the couch "Cpl Dziwanowski was in a position where he was between the wall and Mr. Drury, and Mr. Dury's momentum took Cpl. Dziwanowski and himself into some sort of shelving thing." (Exhibit 16, p. 60) Cpl. Dziwanowski also conceded that Mr.

Drury did not intentionally push him into an object of furniture:

> Q Okay. Is it correct that the force that caused you to be driven into the cabinet was Cpl. Hicks engaging Mr. Drury?
>
> A Not necessarily.
>
> Q All right. Well, let me ask you this way. Mr. Drury didn't lift his hands up to push you against a piece of furniture.
>
> A The momentum of them struggling was what caused me to go up against this piece of furniture.
>
> Q And that's what I am trying to get at. Mr. Drury did not do anything that you witnessed distinct from his engagement with Cpl. Hicks, to intentionally push you into the furniture.
>
> A As far as I know, no.

(Exhibit No. 8, p. 205-206)  Finally, Cpl. Dziwanowksi conceded that Mr. Drury's alleged attempt to bite was actually Cpl. Dziwanowski's own action of wrapping his arm around Mr. Drury's face, that at no point of time was his arm in Mr. Drury's mouth, and that Mr. Drury never clenched his jaw in effort to bite him.  (*Id.*, pp. 207-208)

As a result of the physical assault described herein, Mr. Drury 7-10 ribs were fractured and he also suffered a wrist facture. (Exhibit 19) The criminal charges that Cpl. Dziwanowski directed against Mr. Drury were dismissed by the Office of the State's Attorney for Anne Arundel County. (Exhibit 8, pp. 269-270)

## II.    Argument

It is axiomatic that the "physical entry in to the home is the chief evil against which the Fourth Amendment is directed."[1] *See e.g. United States v. United States District* Court, 407 U.S.

---

[1]  The Fourth Amendment provides:

> The right of the people to be secure in their person, houses, papers and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the

297, 313, 92 S.Ct. 2125 (1972); *see also Katz v. United States*, 389 U.S. 347, 356-57 (1967)(The Fourth Amendment presumptively requires a warrant, which invokes both the Warrant Clause and the Reasonableness Clause).The United States Supreme Court has long accepted the threshold rule that, except when pursuant to valid consent or exigent circumstances, "the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done so pursuant to a warrant." *Steagald v. United States*, 451 U.S. 204, 211, 101 S. Ct. 1642 (1981); *Brighman City v. Stuart*, 547 U.S. 425 Md. 1, 28-29 (2012); *Payton v. New York*, 445 U.S. 573, 590, 100 S. Ct. 1371 (1980). Consequently, "in terms that apply equally to seizures of property and to the seizure of person, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York,* 445 U.S at 590, 100 S. Ct. 1371; *Coolidge v. New* Hampshire, 403 U.S. 443, 474-475, 91 S.Ct. 2022 (1971) ("a search carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show the presence of 'exigent circumstances'").

There are accordingly only four constitutionally permissible ways for a police officer to enter a person's home; namely, (1) with a valid search warrant; (2) with a valid arrest warrant;

---

place to be searched, and the person or thing to be seized.

Article 26 Maryland Declaration of Rights provides:
    All warrants, without oath or affirmation, to search suspected
    places, or to seize any person or property, are grievous and
    oppressive; and all general warrants to search suspected places, or
    to apprehend suspected persons, without naming or describing the
    place, or the person in special, are illegal and ought not be granted.

The protections afforded by the Maryland Declaration of Rights are interpreted in pari materia with the Fourth Amendment, meaning it is generally interpreted in the same manner as the Supreme Court interprets the Fourth Amendment. *Fitzgerald v. State*, 384 Md.. 484, 508-09 (2004)

(3) with voluntary consent; and (4) where exigent circumstances exist. In the instant case, both of the defendant officers have acknowledged their respective understanding regarding the contours of these constitutional restrictions. Cpl. Dziwnaowki was trained, and understood in 2014, that "In order to enter a home to search for evidence or crimes, we would have to obtain a warrant unless exigent circumstances exist." (Exhibit 8, 56-58) He indicated the same general understanding in the context of an arrest. (Id.) He also noted that entry would also be permitted "if we're called to the house and we're invited in…." (Ex. 8, p. 56)  Cpl. Hicks was likewise trained to act in accordance with the United States Constitution. (Exhibit 16, pp. 11-13) He understood that he  did not have lawful authority to make an "unlawful search and seizure" in a home which he described as follows:

> It's – you don't have – I mean, in instances where you would – a search warrant would be required, if you enter and you don't have exigent circumstances to enter a home, or a warrant, then I would – that would be an illegal search and/or seizure, if they seized anything.

(Exhibit 16, p. 12-13)

In the Instant case, three of the four constitutionally permissible means of making a home entry are readily excluded. Cpl. Dziwanowksi conceded that he did not obtain a search or arrest warrant prior to the time of the April 24, 2014 entry into Mr. Dury's home. The defendants therefore cannot assert that they were acting pursuant a valid warrant in the dispositive motion. The defendants also do not contend that Mr. Drury voluntarily consented to the entry and seizure in is home. There would be no good faith basis for such assertions given the record evidence that (1) Mr. Drury was in the process of closing his door before the defendant officers forcibly pushed their way into the home; and (2) Mr. Drury is reported by the offending officers to have advised them they "needed a warrant" and "couldn't be in his house."

Left without an alternative, defendants argue that "there were clearly exigent circumstances for [them] to enter the home." (MSJ, p. 14)  The defendant officers "bear a heavy burden" in attempting to demonstrate that such an urgent need existed in this case. *Welch v. Wisconsin*, 446 U.S. 740, 750, 104 S.Ct. 2091 (1984) The Supreme Court has indicated "hesitation in finding exigent circumstances, especially when warrantless arrest in a home are at issue, [that] is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor."  *Welch*, 446 U.S. at 750.  "Writing in a concurrence in *McDonald v. United States*,[], Justice Jackson explained why finding of exigent circumstances to justify warrantless home entry should be severely restricted when only a minor offense has been committed":

> Whether there is reasonable necessity for search without a warrant certainly depends somewhat upon the gravity of the crime thought to be in progress as well as the hazards of the method of attempting to reach it… It is to me a shocking proposition that private homes, even quarters in a tenement, may be indiscriminately invaded at the discretion of any suspicious police officer engaged in following up offenses that involve no violence or threat of it…. When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant.

*Mcdonald* 335 U.S. 451, 459-460, 69 S.Ct. 191 (1948)(quoted in *Welch*, 446 U.S. at 751)

In *Welsh*, the Supreme Court explained:

> We therefore conclude that the common-sense approach utilized by most lower courts is required by the Fourth Amendment prohibition on "unreasonable searches and seizures," and hold that an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made. Moreover, although no exigency is created simply because there is probable cause to believe that a serious crime has been committed, see Payton, application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense, such as the kind at issue in this case, has

been committed.

Welsh, 466 U.S. at 753. "To determine whether a law enforcement officer faced an emergency that justified acting without a warrant" it is necessary to look at the "totality of the circumstances" and "evaluate each case of alleged exigency based on its own facts and circumstances." *Missouri v. McNeely*, 133 S.Ct. 1552, 1559 (2013).

In the instant case, the totality of the circumstances do not support a conclusion that some emergency existed allowing for the forced entry into Mr. Drury's home on April 24, 2014. Primarily, the supposed crime was "relatively minor" and non-violent. If anything, the police were investigating a simple theft that would more appropriately be described as an unwitting receipt of potentially stolen property. The first 911 dispatcher that spoke with Mr. Bradford and Officer VanAntwerp had independently concluded that any ownership dispute would amount to a "civil matter" in which the police could not be involved. Cpl. Dziwanowski had also indicated that the dispute would likely become a civil matter. The defendant officers had been fully advised by Mr. Bradford that Dale West had maintained uninterrupted possession of the trailer until April 2014, and that she had reportedly sold it to Mr. Drury. The defendant officers were also on notice that Mr. Drury had not had occasion to review the title, tags and registration that Mr. Bradford had exhibited as proof of ownership. Mr. Drury had been advised the prior day that "he could have a couple of days to work it out with the owner of the trailer." (Motion for Summary Judgment, p. 7, para 26). There is no record evidence tending to suggest that the trailer was present on Mr. Drury's property on April 24, 2014, that any evanescent evidence was involved in the case or that the trailer might be harmed. The defendant officers also had knowledge of Mr. Drury's whereabouts and contact information necessary for any future contact.

The defendants' conduct is further dispositive of an existing exigency. Cpl. Dziwanowksi

took no formal action when he first learned of the purported theft on April 23, 2014. After receiving the call the dispatch request on April 24, 2014, he waited more than an hour before initiating travel the Drury residence. Although Cpl. Dziwanowksi claimed to possess adequate information to obtain an arrest warrant at that time, he did not make any application for a warrant. Upon arrival at the Drury home, Cpl. Dziwanowksi and Cpl. Hicks first fixed the latter's computer before attempting to engage Mr. Drury. By their own admission, the defendants had no intention of arresting Mr. Drury when they initially approached his home.

The only claimed exigency identified by defendants in support of their actions is Mr. Drury's status as "fleeing felon when entered his home" (Motion for Summary Judgment, p. 14)[2] For purposes of this argument defendants incorrectly claim authority to initiate a warrantless arrest on April 24, 2014 for the "specified misdemeanor" of theft, which in turn allowed them authority to order Mr. Drury out of his home. Pursuant to MARYLAND ANNOTATED CODE, *Criminal Law Article* § 2-203 "A police officer without a warrant may arrest a person if the police officer has probable cause to believe… a theft crime where the value of the property or services stolen is less than $1,000.00 under §7-104 of the Criminal Law Article…" This authority is not unfettered, however, and is expressly limited to circumstances where there is also probable cause to believe "that unless the person is arrested immediately, the person: may not be apprehended; may cause physical injury or property damage to another; or may tamper with,

---

[2]  This assertion that Mr. Drury was perceived as a felon is inconsistent with Cpl. Dzianowski's own "Application for Statement of Charges" (Exhibit 17) wherein he enumerated four misdemeanor charges against Mr. Drury. Moreover, it is inconsistent with the assertion that "Cpl. Dziwanowski did not obtain an arrest warrant for Plaintiff because he believed theft was one of the specified misdemeanors that do not require a warrant for arrest under Maryland law" (Motion for Summary Judgment, p. 8, para 37)

dispose of, or destroy evidence." Md. Code, Criminal Procedure §2-203.[3]

Because Cpl. Dziwanowski never acted to verify that the trailer Mr. Drury allegedly received was the same trailer identified in Mr. Bradford's displayed title, Plaintiff denies that the defendants had adequate probable to support an arrest for theft.[4] Even assuming, *arguendo*, that there was sufficient probable cause to believe that a theft had occurred, there was no probable cause supporting the second prong of the "specified misdemeanor" statute.[5] The defendants have

---

[3] It would appear that Cpl. Dziwanoski is aware of the limitation applicable to "Specified misdemeanors." During the course of his deposition he claimed that Mr. Drury had indicated to Mr. Bradford, his intention to "destroy" the trailer." Mr. Bradford does not have any recollection of this communication having occurred. There also is no mention of this communication in the Statement of Probable Cause authored by Cpl. Dziwanoski. This accordingly is a matter of disputed fact. However, it can be inferred that Cpl. Dziwanowski only offered this information to support his claim of authority to make an arrest for a "specified misdemeanor."

[4] The defendant officers had not conducted any investigation regarding possession, ownership or identify the trailer. Plaintiff Drury was nevertheless charged with theft in violation of §7-104 of the Criminal Code. Theft is has been defined as a crime consisting of the intentional taking, without legal warrant, of the personal property of another with the unlawful intention to deprive the owner of such property. See MD. Code, Criminal Law §7-104. "The requirement of intentional deprivation makes theft a specific intent crime." *State v. Coleman*, 423 Md. 666, 473 (2011). Property of another "means property in which a person other than the offender has an interest that the offender does not have the authority to defeat or impair, even though the offender also may have an interest in the property." MD. Code, Criminal Law §7-101(j). The Court of Appeals of Maryland held that even an honest belief in the right to receive money or property negates the mens rea element of theft:

> In elaborating upon the claim of right defense the Joint Subcommittee observed:
>
> The claim of right Defense springs from the notion that in cases of common law larceny the defendant must have had an intent to permanently deprive the owner of the property. If the defendant acted under a mistake as to his right to deal with the property, he could not be guilty of larceny. Similarly, if the defendant can produce evidence that he was acting under an honest belief he had a "claim of right," this will be weighed by the trier of the facts in resolving the issue of whether the defendant possessed the requisite mens rea to commit the offense of theft.

Coleman, 423 Md. at 676.

[5] Probable cause deals with probabilities. "These are not technical; they are the factual and

not established any factual need for imminent action and they therefore cannot now prove lawful authority to order Mr. Drury out of his home.

Defendants nonetheless suggest that Mr. Drury's act of closing the door to his home, form inside, after declining to "cooperate" with their attempted interrogation must, as a matter of law, be construed as flight. However, both of the defendants conceded that they had never advised Mr. Drury to that he was under arrest before this occurred. The defendant officers have also conceded that they did not intend to arrest Mr. Drury until such time as he set about closing the door and therefore no apparent pursuit was ongoing. It follows that Mr. Drury, who had not been advised of any legal basis to submit himself to the proposed interrogation nor that he was being placed under arrest, could not be reasonably interpreted to be fleeing. At the very least, this is a matter to be decided by a fact finder.

The Fourth Amendment's prohibition against unreasonable seizures protects not only against arrests made without probable cause, but also against the use of excessive force in making arrests that are themselves supported by probable cause. *See Tennessee v. Garner*, 471 U.S. 1, 7-8, 105 S.CT. 1694, 85 L.Ed. 2d 1 (1985) (Court flatly rejected the suggestion that the Fourth Amendment's reasonableness requirement is satisfied so long as the seizure itself is supported by probable cause, holding that the reasonableness of a seizure depends not only on

---

practical considerations of everyday life on which reasonable and prudent men, not legal technicians act. The standard of proof is accordingly correlative to what must be proved." *Brinegar v. U.S.*, 338 U.S. 160, 175 (1949). The substance of all definitions of probable cause "is a reasonable ground for belief of guilt" and "more than bare suspicion." *U.S. v. Ortiz,* 669 F.3d 439, 444 (4th Cir. 2012). "Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar,* 338 U.S. at 175-76 (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925). The trailer was not present at the Drury residence and the officers had no rational basis, and have not illuminated any facts suggesting they had a rational basis, to believe that Mr. Drury might cause some imminent harm to the trailer.

when it was made but also on how it was carried out); *See also Graham v. Connor*, 490 U.S. 386, 395, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989); *Jenkins v. Averett*, 424 F.2d 1228, 1232 (4th Cir. 1970) (Fourth Amendment provides constitutional protection against use of excessive force during arrest that is vindicable through § 1983). Reasonableness in the context of an excessive force claim is determined by the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

In the instant case, there is record evidence demonstrating that Mr. Drury was struck after he was taken to the ground and after being restrained. There is also a factual dispute as to whether he actively resisted arrest. Because the determination of reasonableness depends on which of the these conflicting versions is to be believed, there must be a trial on the excessive force action asserted under 42 U.S.C. § 1983. Given the parameters of this issue, there also can be no claim of immunity in the context of Plaintiff's excessive force complaint. *See Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009) (law was sufficiently clear to inform reasonable officer "that it was unlawful to catering nonviolent, suspected misdemeanant who was not fleeing resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's command was to disobey two orders to end her phone call to 911 operator"); *Giles v. Kearney*, 571 F.3d 318, 327 (3rd Cir. 2009) ("No reasonable officer could agree that striking and kicking a subdued, non-resisting inmate in the side, with force enough to cause a broken rib and collapsed lung, was reasonable or necessary under established law."); *Valladares v. Cordero*, 552 F.3d 384, 390 (4th Cir. 2009) (clearly unlawful to break jaw of suspect after he surrendered); *Morelli v. Webster*, 552 F.3d 12 (1st Cir. 2009) (clearly

unlawful to use force that resulted in torn rotator cuff a woman who was unarmed, nonviolent, and suspected of theft of $20.00); *Reese v. Herbert*, 520 7F. 3B 1253, 1274 (11th Cir. 2008) (no particularized, pre-existing case law needed to inform officer that he is not entitled to qualified immunity for severe beating of a restrained, nonresisting suspect); *Hadley v. Guiterrez*, 526 F.3d 1324, 1333 (11th Cir. 2008) ("We hold that a handcuffed, nonresisting defendant's right to be free from excessive force was clearly established in February 2002."); *Jones v. Buchanan*, 325 F.3d 520, 532 (4th Cir. 2003) (courts have consistently held that "officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner…").[6]

In order to set forth a prima facie cause of action for false arrest "the plaintiff must establish that 'the defendant deprived him or her of his or her liberty without consent and without legal justification.'" *Okwa v. Harper*, 360 Md. 161, 190, 757 A.2d 118, 133 (2000); *Green v. Brooks*, 125 Md. App. 349, 367, 725 A.2d 596, 605 (1999) ("The elements of false imprisonment

---

[6]   "Excessive force in making an arrest is also a violation of [Maryland Constitution, Declaration of Rights] Article 24, for which a civil claim for damages may lie." *Tavakoli-nouri v. State*, 139 Md. App 716, 730 (2001). The defendants also do not enjoy any immunity from Plaintiff Drury's claims of excessive force under the Maryland Declaration of Rights. In *Clea v. Baltimore*, 312 Md. 662, 680-685 (1988), the Court of Appeals explained:

> "There are sound reasons to distinguish actions to remedy constitutional violations from ordinary tort suits. The purpose of an ordinary tort suit is not specifically to protect individuals against government officials or to restrain government officials....
> On the other hand, constitutional provisions like Article 24 or 26 of the Maryland Declaration of Rights... are specifically designed to protect citizens against certain types of unlawful acts by government officials. To accord immunity to the responsible government officials, and leave an individual remediless when his constitutional rights are violated, would be inconsistent with the constitutional provisions. It would also... largely render nugatory the cause of action for violation of constitutional rights...."

312 Md. at 684-88.

are the same as the elements for false arrest.").  A police officer making a warrantless arrest is liable for false arrest if he acted without legal authority to arrest under the circumstances that exist on the scene. *See Green*, 725 A.2d at 596. The Maryland Court of Appeals "has consistently held that probable cause is not a defense in an action for false imprisonment based upon a police officer's warrantless arrest for the commission of a non-felony offense..." *Ashton v. Brown*, 339 Md. 70, 121-122 (1995); *Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643, 654, 261 A.2d 731 (1973) ("probable cause is not a defense to an action for false imprisonment but legal justification is"); The objective lawfulness of the arrest, rather than the good faith or reasonable belief of the arresting officer, determines liability for the tort. *See Great Atl. & Pac. Tea Co. v. Paul*, supra, 256 Md. at 654, 261 A.2d at 738; *Safeway Stores, Inc. v. Barrack*, supra, 210 Md. at 173-174, 122 A.2d at 460; *Fleisher v. Ensminger*, supra, 140 Md. at 620, 118 A. at 159.

> Thus, while the presence or absence of probable cause to believe that a crime was committed may be pertinent in some cases with regard to the lawfulness of the arrest, the actual element of the tort of false imprisonment is legal justification rather than probable cause. To the extent that the lawfulness of an arrest does not turn upon probable cause under Maryland law, probable cause will not be determinative of the legal justification issue in a false imprisonment action based on that arrest.

*Ashton v. Brown*, supra, 339 Md. at 120.

Maryland's appellate courts have also addressed the issue of whether probable cause was established as a matter of law or whether a factual dispute warranted submission of the probable cause issue to the jury. The Court of Appeals has explained that "under conflicting evidence 'the issues as to probable cause and malice, however great the preponderance of probability may [seem] to be on the side of [the] defendant, [are] issues of fact, not law, and under our theory and system of trials their submission to the jury [is] necessary.'" *Exxon Corp v. Kelly*, 281 Md. 689, 698 (1978), (quoting *Veid v. Roberts*, 200 Ala. 576, 76 So. 934, 934 (1917)).  Accordingly,

where the parties dispute the facts supporting probable cause, the absence of probable cause is a question for the jury. See *Montgomery Ward & Co. v. Cliser*, 267 Md. 406, 298 A.2d 16 (1972); *Safeway Stores, Inc. v. Barrack*, 210 Md. 168, 122 A.2d 457 (1956); *Kennedy v. Crouch*, 191 Md. 580, 62 A.2d 582 (1948); *Glover v. Fleming*, 36 Md. App. 381, 373 A.2d 981, cert. denied, 281 Md. 738 (1977). In this case the jury must decide the facts based on the differing accounts presented by the various witnesses; based on the factual determination the jury must then decide whether the Defendant Officers had probable cause to arrest the Plaintiff.

Defendant officers are not shielded in this case by any qualified public immunity with respect to the individual tort counts. In *DiPino v. Davis*, 354 Md. 18, 49, 729 A.2d 354 (1999), Judge Wilner, writing on behalf of the Court of Appeals, explained that "a police officer, who might otherwise have the benefit of this immunity, does not enjoy it if the officer commits an intentional tort or acts with malice." 354 Md. At 49 (quoting *Cox v. Prince George's County*, 296 Md. 162, 460 A.2d 1038 (1983)); *See also Lovelace v. Anderson*, 366 Md. 690, 705, 785 A.2d 726 (2001) (".... the defense of public immunity generally applies only to negligent acts."); *Parker v. State*, 337 Md. 271, 285, 653 A.2d 436 (1995) (contrasting absolute judicial immunity and qualified public immunity and stating that the later constitutes a defense only to negligence actions); *Cox v. Prince George's County*, 296 Md. 162, 460 A.2d 1038 (1983) (police officer held not to have qualified immunity relative to claims of false arrest, intentional infliction of emotional distress and false imprisonment); *James v. Prince George's County*, 288 Md. 315, 323-24, 148 A.2d 1173 (1980) ("once it is established that the individual is a public official and that the tort was committed while performing a duty which involves the exercise of discretion, a qualified immunity attaches... in the absence of malice...."); *Robinson v. Bd. of County Comm'rs*, 262 Md. 342, 278 A.2d 71 (1971) (public official unsuccessfully asserted qualified public

immunity relative to charges of assault, battery and malicious prosecution).

Plaintiff's intentional tort claims are viable, because the evidence demonstrates that the Defendant Officers acted without legal justification to affect an arrest or utilize force. *See Ford v. Baltimore City Sheriff's Office*, 149 Md. App. 38 (2002) (claim of qualified immunity trumped by showing of malice); *see also Arrington v. Moore*, 31 Md. App. 448, 464, 358 A.2d 909, 918, cert. denied, 278 Md. 729 (1976). It has also been averred that the defendant officers acted maliciously. Questions of malice require a determination of motive and intent and generally present an issue to be entertained by the finder of fact. *See Thacker v. City of Hyattsville*, 135 Md. App. 268, 300-301 (2000) (speaking to issue of summary judgment ruling based on absence of malice) The Maryland Court of Appeals has explained that, in situations such as the instant case, inferences arising from evidence presented by an arrestee challenging a claim of qualified immunity must be drawn in favor of the arrestee. See e.g. *Okwa v. Harper*, 360 Md. 161, 757 A.2d 118 (2000) (reviewing a decision regarding a Motion for Summary).

### III.    Conclusion

There are genuine disputes of material fact in this case which preclude Summary Judgment. The defendants act of forcing entry into Mr. Drury's home can be inferred to be objectively unreasonable and knowing violations of constitutional boundaries. Plaintiff's constitutional claims, as well as the claims from battery, arrest, false arrest and malicious prosecution are thus viable. Moreover, the constitutional claims for excessive force are otherwise viable.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court deny Defendants Motion for Summary Judgment with respect to each of the claims referenced above, and grant such further and additional relief as it deems to be necessary and appropriate.

Respectfully submitted,

_____ - s _____
Anton L. Iamele, Federal Bar No. 14845
201 North Charles Street, Suite 400
Baltimore, Maryland 21201
aiamele@iamelelaw.com
Telephone: 410-779-6160
Facsimile: 410-779-6161