# Exhibit No. 3
# Deposition of James Bradford

In the Matter Of:

*EDWIN DRURY*

*vs.*

*OFFICER P. DZIWANOWSKI, et al.*

*JAMES BRADFORD*

*July 14, 2016*

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF MARYLAND
 3                       (Northern Maryland)
 4    EDWIN DRURY                       :
 5              Plaintiff               :
 6    vs.                               :
 7    OFFICER P. DZIWANOWSKI,           :  CIVIL ACTION NO.:
 8    et al.                            :  1:15-cv-03845-MJG
 9              Defendants              :
10                      --------------------
11          Deposition of JAMES BRADFORD, taken on
12    Thursday, July 14, 2016, at 11:00 a.m., at Iamele &
13    Iamele, LLP, 201 N. Charles Street, Suite 400,
14    Baltimore, Maryland, before Stephanie Sturm, Notary
15    Public.
16
17
18
19
20
21    Reported by:
22    Stephanie Sturm
```

Page 6

1 exhibit.
2     MR. IAMELE: Mr. Culpepper, are you okay
3 with that?
4     MR. CULPEPER: Yes.
5  Q  Can you tell me how old you are, sir?
6  A  Thirty-nine.
7  Q  Where do you live?
8  A  Severna Park, Maryland.
9  Q  Can you give me your address, please?
10 A  506 Likeston Court L-I-K-E-S-T-O-N Severna
11 Park, Maryland 21146.
12 Q  How long have you lived at that address?
13 A  Approximately, three years.
14 Q  In this particular case, we are going to be
15 discussing some events that occurred back in 2014.
16 During that window of time, you were living at the
17 Likeston Court address, were you not?
18 A  No, I wasn't.
19 Q  You were not?
20 A  Yes, yes, right in that area, I moved. Like
21 two and a half, three years.
22 Q  I will represent to you that one of the

Page 7

1 calls that you made to Anne Arundel County indicates
2 that you were residing there. Is that your
3 recollection?
4  A  Yes. I'm just thinking two and a half,
5 three years ballpark.
6  Q  Who do you live there with?
7  A  My wife and child.
8  Q  You are here today in uniform. In what
9 capacity are you caused to wear a uniform? Where do
10 you work?
11 A  Ordnance Road Correctional Facility for Anne
12 Arundel County.
13 Q  How long have you worked at the Ordnance
14 Road Correctional Facility?
15 A  About two years.
16 Q  Are you a correctional officer?
17 A  Yes.
18 Q  Did you undergo any particular training to
19 become a CO?
20 A  Yes.
21 Q  Can you thumbnail that for me very briefly?
22 A  We go through -- just to get hired, there's

Page 8

1 a background investigation, a test. After you pass
2 all of that and you get cleared, defensive tactics,
3 first-aid, CPR, first responding stuff.
4  Q  Who conducts that training program?
5  A  Our training facility, our training
6 department.
7  Q  Was that done by Anne Arundel County?
8  A  I believe it is, yes.
9  Q  In your capacity as a correctional officer,
10 do you work 40 hours a week?
11 A  Forty-eight.
12 Q  Forty-eight hours per week?
13 A  Six eight-hour days.
14 Q  Do you have any other business endeavor that
15 you are engaged in, or occupation?
16 A  I do some snow removal.
17 Q  Have you ever been involved in any
18 landscaping business?
19 A  No.
20 Q  Are you a hunter?
21 A  Am I a hunter?
22 Q  Do you hunt?

Page 9

1  A  Animals?
2  Q  Yes.
3  A  I have, yeah.
4  Q  Is there a taxidermy shop in Anne Arundel
5 County that you frequent?
6  A  Yes.
7  Q  What is the name of that facility?
8  A  Hitchcock Taxidermy.
9  Q  Where is that located?
10 A  New Cut Road. I don't know the address.
11 Q  Have you had occasion to socialize with
12 members of the Anne Arundel County Police Department
13 at Hitchcock Taxidermy?
14 A  What do you mean?
15 Q  Do you ever run into Anne Arundel County
16 police officers over there or talk to Anne Arundel
17 County police officers over there?
18 A  No. Why would we talk? No.
19 Q  No?
20 A  No.
21 Q  Are you friends with any Anne Arundel County
22 police officers?

Page 14

1  Q  And you understood Cathy Jo to be married to
2  Anthony before she was married to Bradford West?
3      MR. CULPEPER: Go ahead and answer.
4      MR. IAMELE: Just for the record,
5  Mr. Culpepper is stepping out.
6      MR. CULPEPER: Yes, I'm stepping out, and I
7  will return if it's still going on.
8      MR. IAMELE: And I understand that we have
9  your consent and authority to continue with the
10 proceedings?
11     MR. CULPEPER: You have my consent and
12 authority to proceed with the deposition without my
13 presence.
14     MR. IAMELE: Thank you, sir.
15 Q  I forgot the question I asked before
16 Mr. Culpepper stepped out.
17 A  Something about Bradford West and Cathy Jo
18 West. I don't know. It was something about them two.
19 Q  We'll move back to that in more precise
20 ways. How about a woman named Dale West or Dale
21 Martin?
22 A  I do not know of her at all. I couldn't

Page 15

1  tell you what she looks like. I didn't even know
2  Bradford West. I knew him as Brad. I didn't even
3  know his first name was the same as my last name.
4  It's weird.
5  Q  Did you have knowledge that at some point
6  Brad married Cathy Jo?
7  A  I had heard that. I had heard that.
8  Q  Did you know that Brad passed away shortly
9  thereafter?
10 A  I didn't even know when he passed away. I
11 heard something through the grapevine he had cancer or
12 something.
13 Q  I'm going to draw your attention back to
14 February of 2014. This may be a little easier.
15 A  All right.
16 Q  Did there come a point in time that you
17 purchased a trailer from Cathy Jo West?
18 A  Yes, and I believe you should have,
19 basically, a signed receipt thing.
20 Q  We'll get there.
21 A  Okay. Yes.
22 Q  Before we get there, I want to ask a couple

Page 16

1  questions.
2      How did you come to know Cathy Jo West was
3  selling this item?
4  A  God, how did I know? I want to say just
5  through mutual friends, because I'm sure I had said,
6  hey, looking for a trailer, and you know how word of
7  mouth is.
8  Q  Why were you looking for a trailer?
9  A  To make moving a skid loader around easier
10 for snow removal, stuff like that. Nothing big. It's
11 actually probably too much -- I mean it's too much
12 trailer, but.
13 Q  Is it correct, sir, that when you purchased
14 the trailer from Cathy Jo, she did not have possession
15 of it?
16 A  No, she didn't. She told me it was -- it
17 was, obviously, sitting under those power lines.
18 Q  We'll get there, too.
19 A  I'm sorry.
20 Q  I recognize that you're anticipating my
21 questions, but in order to make the record, I'll ask a
22 question, you answer it and then we'll move on from

Page 17

1  there. Okay?
2  A  All right.
3  Q  When you made the purchase, she did not have
4  possession of it?
5  A  No.
6  Q  Did she explain to you why she didn't have
7  possession of the trailer?
8  A  She said it was -- she told me that it was
9  her trailer, because I, of course, contacted her to
10 say, hey, I'm looking for a trailer and I heard that
11 you had one that you might possibly sell. It wasn't
12 like somebody said it was for sale. They said you
13 might want to check with this lady and she's got it,
14 and I said okay, I'll give her a call. So I gave her
15 a call and I was told it needed some work, but she
16 would consider selling it.
17 Q  When she told you that she had a trailer to
18 sell, but did not have possession, did she explain why
19 she didn't have possession of it?
20 A  I believe what she told me was it was on --
21 she said it's a weird situation. She said it was her
22 husband's trailer, he went through a divorce, but it

Page 18

was in her name, and I said okay, because I said I don't want any drama or any problems out of a he said she said.

I said I'm going to pay you by check and I want a receipt, and, you know, I don't want anybody accusing me of anything. She said no, no, it's in my name, it's all legal, but she said the problem is the trailer is sitting on BG&E property, but it's behind his house, which is now, I guess, his ex-wife residing there, whatever. Their house, her house, I don't know.

Q   Did Cathy Jo West ever indicate to you why the trailer was located behind Bradford West's ex-wife's home?

A   No. I honestly figured it was just he once resided there and you're going to leave your wife and go marry somebody else. I just assumed where are you going to put a damn near 30-foot trailer? You know? I didn't think nothing of it, no. It's not like you can park it on the street.

Q   Was there ever any point in time when you went over to 8257 New Cut Road, which is where the

Page 19

ex-wife lives, to make a visual inspection of the trailer and, just to sharpen that up a little bit, prior to the point where you tendered the check to Cathy Jo West?

A   Actually, no. I had only seen it from a distance when I dropped a deer off to get processed or something like that. You know what I mean?

Q   Is that at the taxidermy?

A   That's their shop, yes. I don't know the addresses. I would assume it's -- I would assume it's next to her, I don't know, because I can see the trailer from his property. I just don't know the addresses.

Q   Did Cathy Joe West provide you with any photographs of the trailer before you purchased it?

A   No.

Q   So it would be correct that you never actually saw the trailer before you gave her the check for the purchase?

A   Physically like put my hands on it?

Q   Yes.

A   No.

Page 20

Q   And after you purchased it from her, you never took delivery of the trailer?

A   Never.

Q   And you've never had the trailer in your possession at any point in time?

A   No, sir.

Q   When you made the purchase from Cathy Jo West, was there any agreement or understanding as to when and/or how you would take delivery of the trailer?

A   No. She just said that she would make some phone calls. She said it's a new wife and an ex-wife, so she said there would probably be some conflict there, but she would try and work something out so I could get access on the BG&E property through their driveway or whatever. Actually, I said look, that's why I said I want a signed receipt and I'm paying with a check. I don't want any issues with this. I understand it's an as-is buy and needs some work. That's what it was based on.

Q   What did you pay her for the trailer?

A   Don't quote me. I want to say $1,500.00.

Page 21

Q   And the check, was that a personal check that you used?

A   It was a business check for snow removal.

Q   What is the name of your snow removal business?

A   J.R. Lee Home Improvements.

Q   J.R. Lee Home Improvements?

A   Yes, sir.

Q   Is J.R. Lee Home Improvements incorporated?

A   I can't remember. I honestly can't remember. I just use it for snow removal just to be legal.

Q   Do you have any employees?

A   No. It's me. Push snow with a truck and skidsteer every now and now.

Q   Did you have a good year this year?

A   No, I actually didn't do anything this year. I've just been too busy and I didn't do anything.

Q   I'm going to ask you to take a look at what has been marked Exhibit 2 for purposes of your deposition.

A   (Reviewing photographs).

Page 26

1  see, I'm now looking at page 2 of Exhibit 6, in the
2  upper left corner, it appears to me that that says
3  February 4, 2014.
4      A   I don't know what that is. 21 or 4, your
5  guess is as good as mine.
6      Q   These photographs of this title, did you
7  take these? When I say "these", I mean both of the
8  pictures that comprise Exhibit 6 for purposes of your
9  deposition.
10     A   I might have. I'm usually very careful. If
11 I'm doing something like this, I want to document as
12 much as I can. As far as like DMV, they keep the old
13 title, and I just didn't want it to disappear. Yes, I
14 would think I took these.
15     Q   But you're not able to say for sure?
16     A   I'm not able to say for sure. I would lean
17 toward -- I know that DMV would keep the title. Like
18 this title, I don't know where it would be now, but if
19 you go to DMV to do a title transfer, they keep the
20 old title, I believe, and I think I wanted to make
21 sure I had some sort of documentation that this is all
22 her information and nobody else's.

Page 27

1      Q   Let me ask you this. Once you purchased the
2  trailer, recognizing that you didn't get physical
3  possession of the trailer, what did you leave from
4  Cathy Jo West's house with? Did she give you
5  anything?
6      A   Just, I think, the title -- no. Hold on. I
7  think it was just the title. I think I just gave her
8  a check and she handed me the title, and I felt
9  confident that that was sufficient, and I made her
10 sign a written receipt.
11     Q   Do you, by chance, have a copy of the
12 receipt?
13     A   I thought it was turned in.
14     Q   And I want you to appreciate this. This is
15 a different proceeding than the criminal proceeding,
16 so some of what you tendered to the State's attorney I
17 may not be privy to.
18     A   I don't know. I would have to -- I would
19 have to look or something.
20     Q   Once you obtained the title to the trailer,
21 what was your next course of action?
22     A   I wanted to further validate what I have

Page 28

1  seen and what I have been told and I went to the DMV.
2  When I went to the DMV, I explained the situation to
3  the person behind the desk, and I said before you
4  transfer this title, can you verify that this is the
5  only owner of this trailer, that this is the only
6  registered owner to the trailer, and they confirmed
7  yes, it was, and I said okay, because I'm buying this
8  in a supposed divorce and I don't want any problems.
9  She's assuring me that it's legal and I said okay.
10     Q   What, if anything else, did you do?
11     A   I paid for the title and temporary tags,
12 because they said it was clean. I said I paid for the
13 tags, temporary tags, title transfer, and I think that
14 was it, I think.
15     Q   And then what was your next course of
16 action?
17     A   I think Cathy, I think, had tried to -- I
18 think there might have been contact to whoever it is,
19 his ex-wife and, apparently, it didn't go well.
20     Q   I imagine not.
21     A   Right. You know what I mean? And it was
22 basically put to me like, yeah, she don't want anybody

Page 29

1  on her property.
2      Q   Who told you that? Cathy Jo?
3      A   Yeah.
4      Q   At that point in time, you had a title that
5  was issued to you by the DMV?
6      A   By DMV.
7      Q   In your name?
8      A   Yes, sir.
9      Q   And you also had the temporary tags?
10     A   Yes, to be able to transport.
11     Q   Sure.
12         Do you currently have possession of that
13 title and those temporary tags?
14     A   Somewhere.
15     Q   Once Cathy Jo contacts I'm going to call her
16 Dale Martin, that's Bradford West's ex-wife --
17     A   Dale?
18     Q   Dale. And indicates that she wanted access
19 of the property to get the trailer and --
20     A   This is what I was told.
21     Q   And this is all told to you by Cathy Jo
22 West?

Page 30

1  A  Yes.
2  Q  Can you put a timeframe on that? How many
3  days after the purchase?
4  A  I told her, I said get the ball rolling,
5  because if I go and buy it, I want to start working on
6  the trailer and getting it cleaned up. I just bought
7  it from you, and I'm not just buying something from
8  you for you to just sit on.
9  Q  When you went to the DMV, was it the same
10  day that you made the purchase?
11  A  It couldn't have been. If it wasn't the
12  same day, it wouldn't have been but the next day or
13  two.
14  Q  Within the week?
15  A  Oh, yes, yes.
16  Q  Did you ask Cathy Jo to facilitate your
17  access to the trailer within a week?
18  A  I just made a blanket statement I'm going to
19  go down to DMV and I want to make sure through them
20  that everything you're telling me is accurate before I
21  transfer this. I said if they tell me otherwise, then
22  I'm coming back and I'm canceling my check. I said

Page 31

1  but if it's legit, and she assured me it was, then I
2  would expect to get the trailer in a reasonable amount
3  of time, because I was going to take it and have it
4  sandblasted and everything else, cleaned up and all
5  new boards put on, stuff like that, the lights.
6  Q  Get it back to running order?
7  A  Yes.
8  Q  Do you happen to know how long the trailer
9  had been sitting behind the New Cut Road address?
10  A  I couldn't tell you at all. I don't pay
11  attention, not to that stuff. I didn't care.
12  Q  Was there ever any point in time that you
13  personally went to 8257 New Cut Road in an attempt to
14  pick up the trailer?
15  A  What is "8257"?
16  Q  That's the property that is contiguous with
17  the power lines shown in this photograph.
18  A  You mean the property in front of where the
19  trailer is sitting?
20  Q  Yes.
21  A  No, I never, no, because she told me that it
22  was in a divorce, so to me that's trespassing.

Page 32

1  Q  You never went there and talked to the woman
2  who lived in that home?
3  A  No. I don't think anybody was living there.
4  I actually think the house was not abandoned, but I
5  don't believe anybody was living there.
6  Q  Was there fencing around that property?
7  A  No. There's a dividing fence, just like
8  panel fence between that property and that property,
9  but nothing that gated front or back. You know what
10  I'm saying? And being that it abutted BG&E property,
11  you would think there would be a back fence to
12  separate you from other property, but, no.
13  Q  Can I ask you this, Mr. Bradford, if the
14  house was seemingly abandoned and the trailer was
15  sitting in the back there, why didn't you simply go
16  over there and pick it up?
17  A  Because it wasn't on legal property. That's
18  trespassing. I'm not going to do it. If I would have
19  had Gail's permission -- is it Gail?
20  Q  Dale.
21  A  Dale. If I had had Dale's permission, or
22  had a way to contact her and she would meet me there,

Page 33

1  I would have removed it, but I'm not like that.
2  Q  At any point in time, did Cathy Jo West
3  indicate to you that Dale Martin was refusing to allow
4  you access to the trailer because it was marital
5  property in the divorce between Bradford West and Dale
6  Martin?
7  A  Again, of course, it was divorce talk and
8  just what I took as bickering between a new wife,
9  ex-wife, and, you know, there's always a sour taste.
10  That's all I took it as. It wasn't like no, you're
11  not taking it because. You know what I mean? Like
12  I'm not letting anybody come through my property.
13  That's basically how it was put to me. And that's --
14  go ahead.
15  Q  If I were to indicate that almost three
16  months elapsed from the date that you purchased the
17  trailer until the date that you called the police on
18  April 23, 2014, is that about correct?
19  A  If there's something documenting it, but
20  other than that, I don't remember. I couldn't tell
21  you.
22  Q  And other than the one communication you

Page 34

1  just described with Cathy Jo West, did you have other
2  communications with her about gaining access to the
3  trailer?
4      A   No. Just basically what I've told you.
5  She's not easy to get ahold of either. That's another
6  reason there. But nothing led me to believe that,
7  once DMV confirmed it was her name and solely in her
8  name and there was no garbage with the divorce, I
9  didn't have any frets that it wouldn't -- I was just
10 like okay, I'm a patient person, whenever the grudge
11 is over, I'll grab it. I had no immediate use for it.
12 I was just going to get it cleaned up, and that was
13 going to take some time in itself and there was
14 $1,500.00 on the line. It wasn't like a $10,000.00
15 deal. You know what I mean?
16     Q   Is it correct that from the date that you
17 purchased the trailer until the date that you called
18 the police the first time on April 23, 2014, you had
19 never had physical possession of the trailer?
20     A   I've never touched the trailer. I don't
21 think I've ever even more than -- I can say I
22 definitely took that picture, but, again, I'm on BG&E

Page 35

1  property and that's all the contact I'll have with it.
2      Q   And you've never had that trailer on any
3  parcel of your property? I know that's an obvious
4  question, but.
5      A   No. Shit, I ain't even got room for it.
6  I'm sorry to say "shit".
7      Q   I'm sure she's heard it before.
8          I'm going to show you what has been marked
9  Bradford 3. I know it's a document you may not be
10 familiar with. I'll represent to you that this is a
11 CAD record, which is a Computer Aided Dispatch record.
12 Okay?
13     A   (Reviewing document). Okay.
14     Q   It is a call for service from 7973 Catherine
15 Avenue on April 23rd at 19:12:55, which is 7:12 p.m.
16     A   Catherine Avenue, where is that? Oh, is
17 that the Royal Farm?
18     Q   Let me ask you this way first.
19         Do you recall making a telephone call to 911
20 on April 23, 2014?
21     A   I don't know about the date, but I
22 definitely called the police in reference to this

Page 36

1  trailer.
2      Q   When you called the police, was it 911?
3      A   Yeah. I think non emergency, I think.
4  Yeah, it would be the police, wouldn't it? You call
5  the police.
6      Q   Before you called the police on April 23,
7  2014, did you ever make any criminal complaint
8  regarding the trailer, meaning had you reported it
9  stolen, had you indicated that somebody was not
10 allowing you access to it?
11     A   I don't believe so. I don't believe so.
12     Q   So this would be the first occasion that you
13 made formal efforts to try to gain access to the
14 trailer?
15     A   Yeah, possibly. This is two years ago. I
16 mean if this is the only record, I would say yeah.
17     Q   Prior to that, had you ever asked Cathy Jo
18 for your money back?
19     A   No. Like I said before, I knew there was no
20 immediate use for it. The trailer needed a lot of
21 work and there was no intention to be like, okay, I'm
22 going to go get the trailer and use it next week. You

Page 37

1  know what I mean? I was in no hurry. I had plans to
2  completely restore the trailer and bring it back to
3  good working order, so it wasn't going to be readily
4  available anyway.
5      Q   Let me play a call for you. I'm going to
6  play what Mr. Culpepper and I have agreed is the 911
7  call from that date, and then I'm going to ask you if
8  it's your voice, and then I'm going to ask you some
9  questions about it. Okay?
10     A   Okay.
11         (911 recording playback).
12     Q   I want to ask you a couple questions about
13 that. First and foremost, that's your voice?
14     A   Yes, yeah. At first, I was like that
15 doesn't sound like me, and then I remembered I had
16 just gotten out of the hospital with the flu.
17     Q   You were driving a burgundy Maxima at that
18 point in time as a rental car?
19     A   I guess, apparently. I would never be in a
20 car.
21     Q   You made some indications during the course
22 of that call and I want to know how you came in

Page 38

1 possession of the information. For example, you
2 indicated to the 911 operator that the trailer had
3 been titled to the woman who sold you the trailer her
4 husband's name. What did you understand about that
5 and how did you come to understand that?
6   A   Say it again.
7   Q   Sure.
8       Do you remember how you came to understand
9 that at some point the trailer had been titled in --
10  A   In his new wife's name.
11  Q   In the call, you said it had been titled in
12 the husband's name initially.
13  A   I didn't hear that.
14  Q   Do you want to go back and play it again?
15  A   It doesn't matter. I mean I know I said it
16 was in his new wife's name.
17  Q   You did.
18  A   My apologies.
19  Q   That's okay.
20      (911 recording playback).
21  A   They told me at the DMV. That was just
22 verbally said to me.

Page 39

1   Q   So the DMV told you that at some point the
2 trailer had been in Bradford West's name?
3   A   Yes.
4   Q   And you understood Bradford West to be Cathy
5 Jo West's now deceased husband?
6   A   Yes.
7   Q   And you understood Bradford West to be Dale
8 West's ex-husband, the woman who was holding you
9 hostage? I know it's complicated.
10  A   Yes.
11  Q   And that was told to you at the DMV?
12  A   Yes, the DMV confirmed, because I said I
13 need to make sure, just being a logical person, I want
14 to know that there is no other name other than a
15 possible Brad West or Cathy West related to this
16 title. If there's any other names on it, I was going
17 to refuse it and go back to Cathy and get my money
18 back, or cancel the check.
19  Q   Did whomever you spoke to at DMV tell you
20 when the title had been transferred from Bradford West
21 to Cathy Jo West?
22  A   They just said it was clean and it had no

Page 40

1 other names than the two that I mentioned to them.
2   Q   Now, you also indicated to the 911 operator
3 that you had some understanding that Dale Martin, who
4 was the woman who lived at the property where the
5 trailer was located, sold it to somebody?
6   A   Right.
7   Q   Tell me about that? How did you come to
8 know that she had sold it?
9   A   It was more of an assumption, because a
10 company truck was seen pulling out with the trailer
11 off the property, and it was brought to my attention
12 that there were some other people here moving a
13 trailer that wasn't theirs.
14  Q   And based on that, you came to understand
15 that Dale Martin had sold it to somebody?
16  A   I assumed she had. Somebody was moving a
17 trailer that I knew I just bought.
18  Q   I understand that.
19      What I'm looking for, it's a pretty specific
20 thing to say, this woman who doesn't have a right to
21 this trailer sold it to somebody, and what I'm trying
22 to investigate is how you came to know that she made a

Page 41

1 sale?
2   A   Because there was a company name on the
3 truck and info, because it was a commercial vehicle I
4 believe, and I took that information and looked it up
5 and then called the number and spoke to -- at the
6 time, I didn't know who it was, but it was apparently
7 the guy that took the trailer. I was very cordial
8 about it, I said, sir, I think there's been a mistake,
9 and I want to make sure neither one of us gets screwed
10 here.
11      You were seen picking up a trailer, which
12 that person said yes. I said that trailer is mine. I
13 said I bought that trailer. It's a weird situation,
14 but I went and bought the trailer. I went to the DMV
15 and had everything confirmed, and I have a title and
16 registration for that trailer with temporary tags, but
17 I was not allowed to move it.
18      That was his next question, why didn't you
19 go get it? I said because I was told I wasn't allowed
20 on the property through another source, which was
21 Cathy, and he said well, I just bought the trailer and
22 you're not getting it.

Page 42

1   I said look, I'm trying to be cool here.
2   I'm letting you know that if you don't return the
3   trailer, I'm going to have to call the police and
4   report it stolen, because I have everything here that
5   says it's mine. He started getting a little nasty on
6   the phone, and I said I'm not going to argue with you,
7   just give me the trailer back and squashed. I don't
8   care. I mean it's a mistake.
9        You can go take it up with her. You
10  probably don't even know all of this. I said I'm
11  trying to help you out and help myself out. He goes I
12  paid $2,200.00 cash for this trailer. I said well,
13  you need to take that up with her, because she sold
14  you a trailer that she shouldn't have sold. I said
15  I'm telling you I have a legal title and registration
16  for this and no reason to say it's not mine.
17    Q   When was that conversation, do you know?
18    A   I can't remember the day it was pulled out.
19  I don't know. I don't know.
20    Q   Just to backtrack on a couple things.
21        The truck that removed the trailer from the
22  property, that's not something that you personally

Page 43

1   observed, is it?
2     A   No.
3     Q   Who told you that the trailer had been
4   moved?
5     A   The neighbor.
6     Q   What is his or her name?
7     A   I think it's one of the neighbors, the
8   people next door at the taxidermy shop.
9     Q   How did they know to contact you when the
10  trailer was moved?
11    A   They didn't. They knew I was -- I told them
12  I said I'm buying that trailer. I said I found the
13  owner and I'm working out a deal. I'm working out a
14  thing about a trailer, but, apparently, because of the
15  divorce I can't go get the trailer, and I have to see
16  what's what waiting for this to pan itself all out.
17  Then they saw that it was like a small dump truck or
18  something they said that picked it up, hooked up to it
19  and pulled it out of there. They were just being
20  observant.
21    Q   They knew to call you, because you
22  previously had a conversation where you said I'm

Page 44

1   buying the trailer?
2     A   Yes. I'm one of their customers. They were
3   being observant and said hey, I thought you were
4   buying that trailer, and I said I did. They said are
5   you having somebody tow it out of here? I said no.
6   They said well, somebody's pulling it out of here with
7   a small dump truck, a commercial truck.
8     Q   Did they describe the person who was pulling
9   it out of there?
10    A   No. They just saw the lettering on the
11  truck, the name and the number, and then I looked it
12  up.
13    Q   They just told you the truck that removed
14  the trailer?
15    A   Yeah, because they thought it was being
16  stolen. They were looking out for everybody. It
17  wasn't like, hey, this is your trailer leaving. It
18  was I think somebody might be stealing this trailer
19  then, because they thought I was buying it and then
20  here somebody shows up and is hauling it out of there.
21  Like I told you, I believed the property at the time
22  was not being lived in.

Page 45

1     Q   I think Dale Martin was living there at the
2   time.
3     A   I don't know.
4     Q   And I believe the trailer, I'll represent to
5   you, was locked up at the time.
6         So once you received that telephone call and
7   that information, what was your next course of
8   conduct? What did you do?
9     A   After I contacted the supposed driver of the
10  truck?
11    Q   Just to get the timeline right, someone from
12  the taxidermy shop called you and says I saw a truck
13  with High Noon Paving removing the trailer. You then
14  did like an internet search I'm assuming?
15    A   Yeah, um-hum.
16    Q   And you got a telephone number for High Noon
17  Paving?
18    A   Um-hum.
19    Q   You called immediately thereafter?
20    A   A short time after. Like I said, I was down
21  with the -- I wasn't even out. Like I hadn't been out
22  in almost two weeks. I had the flu and everything. I

Page 46

1  was down.
2   Q   And the person to whom you spoke said I
3  purchased the trailer from Dale Martin, or the woman
4  who was at that house?
5   A   I bought the trailer. That's all that was
6  basically said.
7   Q   And he told you the purchase price?
8   A   Yes. I said I've already previously bought
9  this trailer. I said I think there might be some
10 mistake here, and I think you need to keep this from
11 getting ugly for people that don't need to get ugly
12 for.
13  Q   Do you have a recollection of the police not
14 responding to your initial call?
15  A   No. I think it just took a while, if I'm
16 not mistaken. I think I was sitting there for quite a
17 while.
18  Q   I have records that show you made a second
19 call to 911 at or about 8:01 p.m. on the same day,
20 April 23, 2014. Do you recall that?
21  A   Do you have any cops around here?
22  Q   I'll give you the benefit of hearing this

Page 47

1  one, too.
2   A   Is it me getting mean?
3       (911 recording playback).
4   Q   I'm going to stop it there and ask a couple
5  questions.
6       Having heard this, first and foremost, is
7  that your voice?
8   A   Um-hum.
9   Q   Yes?
10  A   Yes.
11  Q   And now that you have heard this, do you
12 remember making a second call to 911?
13  A   Obviously, yeah.
14  Q   Again, you make an indication that the
15 person who was on the property sold it?
16  A   Again, assumption. I should have said that.
17  Q   And you also indicate that a gentleman had
18 picked it up from the property. Was that also an
19 assumption?
20  A   I don't know. It could be chicks running
21 around dump trucks. It's fair to say. It's a paving
22 company with a woman driving it. I just assumed it

Page 48

1  was a guy.
2   Q   My point being no one told you who was
3  driving the dump truck?
4   A   No, no.
5   Q   And you didn't see anyone driving the dump
6  truck?
7   A   No. I was in bed.
8   Q   So you're assuming it at that point in time?
9   A   Yes.
10      (911 recording playback).
11  Q   After you made that second call on April 23,
12 2014, did an officer come and meet you at the Royal
13 Farm store?
14  A   Eventually, yes.
15  Q   Did you and he have occasion to speak?
16  A   He just wanted to see the documentation that
17 I was talking about. Obviously, he saw what I had and
18 saw that I was telling him what appeared to be very
19 accurate, because DMV, everybody validated this
20 paperwork.
21  Q   I understand that.
22      More specifically, did the reference that

Page 49

1  you had made in both of your calls to 911 that you
2  believe that the person who took the trailer had
3  purchased it, or that it had been sold to him, did you
4  explain that to the officer?
5   A   Yes. He said how did the trailer get here?
6  I said well, I was called. I said, obviously, I'm
7  sick as a dog, but I was called. I was laying in bed
8  and I was told that the trailer was either being
9  stolen or had been sold, because it's leaving not by
10 me and these people knew that I was buying the
11 trailer.
12  Q   At that point in time, had you already had
13 the conversation with the gentleman who told you he
14 purchased the trailer?
15  A   Yes, because I didn't want it to be a big
16 ordeal. I thought we could talk about it like men
17 and, hey, I want to show you that I legally obtained
18 this trailer and blah, blah, blah, and I'm not just
19 telling you that, and I got the paperwork to validate
20 what I'm telling you. He didn't want to hear it.
21  Q   Did you tell the officer that you had called
22 someone at the number you connected with High Noon

Page 50

1  Paving?
2  A  I believe I did, because I wouldn't have
3  left something like that out.
4  Q  Do you recall telling the officer that that
5  person reported to you that he had purchased the
6  trailer?
7  A  Yes.
8  Q  Now, the two of you were at Royal Farm
9  store. What happens next?
10 A  I believe we just ride over, I followed him
11 over just to do it right, have an officer there and
12 everything, and nobody was there. I think his wife --
13 we were walking away and it was either his wife or an
14 older female, put it that way, answered the door as we
15 were walking away and asked what was going on. He,
16 basically, did most of the talking.
17 Q  "He" being the officer that you were with?
18 A  Yes, because you don't want the people
19 arguing and stuff, and I wasn't there to argue.
20 Q  Do you remember what he said?
21 A  No. Obviously, is your husband or somebody
22 home that runs this business, and she said no, and he

Page 51

1  said he needs to contact us, or whatever, there's
2  something in question, I guess. I don't know. It was
3  just real short and sweet.
4  Q  Did you observe any trailer on the property?
5  A  No.
6  Q  Did you observe a High Noon Paving dump
7  truck on the property?
8  A  No.
9  Q  Were there any vehicles marked High Noon
10 Paving proximate to that?
11 A  No, I don't believe there were any
12 commercial vehicles with any lettering at the
13 property, which wouldn't be common. That was a
14 residential area and that's commercial equipment.
15 Like I said, you don't park a dump truck and a damn
16 near 30-foot trailer on the street.
17 Q  Once the officers had this conversation with
18 the woman who answered the door, what happened next?
19 A  Just gave me his card and a contact number
20 and he would follow up with it, but, obviously, there
21 wasn't nothing that we could do at the moment. No one
22 was there, no trailer, no people, and the lady at the

Page 52

1  door, she had no idea.
2  Q  Do you recall the officer having any kind of
3  telephonic conversation with anybody?
4  A  You know what, I think she went and got her
5  cellphone maybe. Bear with me, it was two years ago.
6  Something like that. For some reason, I want to say
7  she either went and got a house phone or a cellphone,
8  like a cordless phone or a cellphone and might have
9  called him, because he wasn't there to let him know.
10 Maybe the officer did speak to him. Now that you say
11 that, I do remember her going to get a phone, because
12 she was standing in her doorway and she went to get a
13 phone.
14 Q  Do you remember the substance of that
15 conversation at all?
16 A  No, sir. Until you said that, I didn't.
17 Q  And you didn't see any male resident of the
18 house that day?
19 A  No. There was just an older lady I assumed
20 lived there. She appeared to live there.
21 Q  Just to make the record clear, there were
22 three people there, one of whom was you, one was the

Page 53

1  officer and one was a female?
2  A  The older female at the residence.
3  Q  Now, when you left, did the officer indicate
4  to you that you should make any kind of formal
5  reporting that this was a stolen object?
6  A  I think we did start the process of
7  reporting it stolen.
8  Q  Tell me about that? What did you do?
9  A  I can't remember how we went about it.
10 Q  Did you do it on-site? Did you do it at
11 7973 Catherine Avenue?
12 A  I don't know. I really don't.
13 Q  Did you sign any paperwork?
14 A  I don't recall.
15 Q  Did you give the officer who went to the
16 property with you anything in terms of documentation?
17 A  No. I think it was all just visual. I
18 showed him -- I know I definitely showed him the
19 title. I definitely showed him the bill of sale.
20 Pictures of the trailer -- no, no, I'm lying. I just
21 showed him all the paperwork validating the legal
22 title and everything for the trailer to validate that

Page 54

what I was calling them for was accurate.

Q  Did the officer who was present with you take any of that material from you?

A  I don't think so. No, I don't think so. I think I made copies or something. I don't think he took anything with him, no.

Q  The officer who was present gave you his card?

A  Um-hum.

Q  And when he gave you his card, what, if anything, did he say to you?

A  I think he said he would follow up and try to make contact later at another time when the fellow was home and that he would contact me, or if he didn't contact me, to check back with him.

Q  To your knowledge, did the officer provide any of your information to either the woman who was present at the house, or the person to whom he was speaking on the phone?

A  As in like physical?

Q  Name, phone number.

A  I don't know.

Page 55

Q  Do you know if the officer --

A  I'm actually hard of hearing and I actually stood back per his request. I stayed a respectful distance not to have two big guys standing at your door. You know what I mean? Me being somebody looking for something, it just doesn't look right, so he had me stay back. I was 20 feet back give or take.

Q  Mr. Bradford, would it be accurate to say that you really weren't able to hear what was happening during the conversation back and forth with the officer?

A  It's fair to say. Like I said, he was doing a lot of talking just as an officer would do to keep the peace not knowing who was going to answer the door.

Q  And when you left 7973 Catherine Avenue, was there any expectation as to if or when --

A  I left no further ahead than when I called.

Q  Did you have any belief that the trailer was going to be returned to you the next day?

A  Honestly, I thought it would be. I thought they would make contact. After showing all of the

Page 56

information, documentation that I had, I really thought it was going to be cut and paste and, man, it was a mistake or whatever and you've got to take her to court and sue her or something. You know?

Q  Explain that to me?

A  I would assume if you bought the trailer, that he would have to go after Dale, the ex-wife. I don't know.

Q  At that point in time, you relayed to this officer what you came to know, which is that Dale Martin sold this trailer to this gentleman?

A  I think he might have told him that. I think he might have told him, because he told me at that time. By that time, he had told me that he bought it.

Q  "He" being, I'll use the name Edwin Drury, told you that on the telephone before you went to the property?

A  Oh, yeah, because I called him. I'm not just going to roll up on somebody's house and give me my trailer. I wanted to explain to him you were seen leaving the property. It was a real simple phone

Page 57

conversation. You were seen leaving the property with the trailer, I have documentation proving that I bought it, and that it's legally titled and registered in my name, and I have temporary tags to transport it. He told me he bought it for $2,200.00, I think, and it's his trailer. I said I'm telling you you're mistaken.

Q  And that's before you went to the property?

A  Yes, that was earlier in the day.

Q  And you told the officer who met you at Royal Farm that it had been reported to you that Dale Martin sold the trailer to this gentleman; correct?

A  Yes.

Q  Do you know when the officer had a conversation with Edwin Drury if he, again, told him he purchased the trailer?

A  I have no idea. I wasn't around for anything after that.

Q  Was there ever any conversation between you and the officer that the proper party to pursue criminally would be Dale Martin?

A  I don't know. I mean I really don't know.

Page 62

1  A   I only recall speaking to him that one time
2  to try and solve the issue, like, hey, I want to show
3  you what I have, you have a stolen trailer.
4  Q   And that one time was the day before,
5  April 23rd?
6  A   Yeah, because I wouldn't have called the
7  cops without trying to at least contact the guy and
8  say hey, I don't want to put nobody in trouble that
9  ain't got to be.
10 Q   The indication that you have information on
11 who currently has the trailer, do you know what that
12 was in reference to, where it says here Caller advised
13 someone sold a trailer who did not have authority to
14 sell it, has the information on who currently has the
15 trailer?
16 A   He did.
17 Q   So it's the same information as the day
18 before?
19 A   Oh, yeah.  I mean unless you know something
20 I don't know.  To this day, to this day, that's the
21 last time I've seen the trailer.
22 Q   When you took the photograph that is marked

Page 63

1  as Bradford 1?
2  A   Yes.
3  Q   And that was before the date that you
4  purchased it?
5  A   That's the last time I've seen it, and the
6  last thing I was told by the fellow I spoke to on the
7  phone was I have the trailer and you're not getting
8  it.  That was told directly to me.
9  Q   In conjunction with saying he bought it?
10 A   Yes, because he felt as though he bought it.
11 He said I paid cash for it.  I said wouldn't you think
12 it's odd that you paid cash for something and you
13 didn't get any title or anything for it?  I said I
14 have a title for it.
15 Q   Do you remember if any member of the Anne
16 Arundel County Police Department came to your house at
17 506 Likeston Court in response to the call on
18 April 24th?
19 A   I don't know.  I think I sent -- I think I
20 sent -- the reason why I think these are bigger now is
21 because I think I sent an e-mail, because I was asked
22 if I had pictures, or anything like that, or copies of

Page 64

1  any of the paperwork.  I think because I was sick and
2  didn't want to go anywhere, I think I just took
3  pictures with my phone and e-mailed them, I think.
4  That's all that pops into my head.
5  Q   Do you know what, if anything, happened in
6  response to your telephone call to the Anne Arundel
7  County Police Department on April 24th?
8  A   Do I know what, if anything, happened?
9  Q   Yes.  Was there any response?
10 A   Just that I believe I was told that he was
11 arrested, and they still don't know what's up with the
12 trailer.  To this day, I don't know.  That's why I
13 called you, I think, two days ago and left you a
14 message?
15 Q   Me?
16 A   Uh-uh.
17 Q   I don't think I got that, I'm sorry.
18 A   Well, I called the office and I said I have
19 no clue what you might want from me.  I'm at work and
20 you won't be able to get me.  I'm on daywork and you
21 won't be able to get me until about 3:30 or, I think,
22 4:00 I said.

Page 65

1  Q   You did not go to 7973 Catherine Avenue on
2  April 24th, did you?
3  A   The Royal Farm?
4  Q   No.
5  A   I didn't go anywhere.  The only time I went
6  to the gentleman's house was the day that I was
7  waiting ever so patiently for the police, and then we
8  spoke to the lady at the house.  That was it.
9  Q   Did you ever give any officers from Anne
10 Arundel County contact information for Cathy Jo West?
11 A   I don't know.  I mean a bill of sale, the
12 title, the picture of the old title, the picture of
13 the new title with my name on it.  I don't know.
14 Q   Have you ever initiated any legal action to
15 try to gain possession of the trailer, meaning a
16 replevin action, a wrongful detainer action, a
17 wrongful conversion action?
18 A   Honestly, I haven't, because I've got bigger
19 fish to fry.  What I deal with in a day, this trailer
20 is peanuts.  You know, karma, I don't deal with people
21 like that.  Things will sort themselves out and maybe
22 one day I'll get a phone call, hey, here's your

Page 66

1 trailer. I'm not pressed about it. I've got bigger
2 issues. I've got a daughter with special needs and
3 this stuff is petty to me.
4    Q   Did anybody ever indicate to you that you
5 could pursue such a civil action?
6    A   Yeah, many people have, but, like I said,
7 it's been an interesting couple of years, and I have
8 more important things to worry about. This will all
9 wash out one way or another. I know it wouldn't
10 happen overnight or whatever, especially knowing now
11 it was in a divorce and all that crap.
12    Q   Did you have any communication with Cathy Jo
13 West, or have you had any conversation with Cathy Jo
14 West since April of 2014?
15    A   I just told her, look, that one time I told
16 you figure it out whatever you need to do. I bought
17 this trailer from you, and I'm holding you responsible
18 to get me access to what I bought. You can't go
19 selling things and then the people not be able to have
20 them.
21    Q   That was before you went to the property?
22    A   Yeah. That was back when we were talking in

Page 67

1 the very beginning. I don't even think she lives
2 around here anymore.
3    Q   Were you familiar with a dump truck for sale
4 as well?
5    A   No.
6    Q   Do you know if Cathy Jo West and Dale Martin
7 have been engaged in any litigation since the time of
8 this happening?
9    A   No. I bought a trailer. I mean really, if
10 I knew something, I would tell you. I bought a
11 trailer, and I thought I crossed all my T's and dotted
12 my I's to buy it to make sure what I was buying was
13 legit, and from what I was told by DMV, her paperwork
14 was legit.
15    Q   Did the police officer that you met with on
16 April 23, 2014 ever indicate to you that you could
17 file a civil action?
18    A   Yes, I was told I could go to court. Again,
19 I had --
20    Q   I understand you had a lot going on. I just
21 want to know if that officer ever indicated to you --
22    A   Yeah, it would be turned into a civil matter

Page 68

1 probably. I don't even know what happened after they
2 said he was arrested. I don't even know. I have no
3 clue.
4    Q   Just to be precise for the record, on April
5 23, 2014, you go out to the property with an officer,
6 the trailer is not there, the person who you spoke to
7 wasn't there --
8    A   The reason I didn't do anything was --
9    Q   Bear with me for a minute.
10        Did that officer tell you that particular
11 day that you could initiate a civil action to gain
12 possession of the trailer?
13    A   No. Just said it would probably turn into a
14 civil matter, but that was before he got arrested,
15 which I assumed eventually this would pan out, because
16 he got arrested and then I would get my trailer back,
17 but, to this day, I couldn't tell you anything about
18 that. I didn't feel the need to go further, because I
19 figured okay, he got arrested, it's clearly going to
20 get sorted out. I'm not going to waste the time or
21 money to go to court when I don't need to, because
22 this is all being washed out and life happens and I'm

Page 69

1 just figuring all right and then I get a subpoena.
2    Q   The same officer who you were present with
3 at 7973 Catherine Avenue on April 23rd, is that the
4 person who told you this would likely turn into a
5 civil matter?
6    A   Um-hum.
7    Q   Is that a yes?
8    A   Yes. I'm sorry. And so did the 911
9 operator.
10   Q   Before you ever went out to the property?
11   A   Right. Again, that's where it was going to
12 go, but, in my eyes, once he got arrested, I said
13 okay, then this is going to -- this is accurate. This
14 is what's going to happen and I'll get my stuff back.
15 I said I'm not going to waste the time and money
16 getting a lawyer when it looks like the law is taking
17 care of it, or laws.
18   Q   We heard the tape earlier today and the
19 recording. The 911 operator that you initially
20 contacted told you this is a civil matter in which the
21 police cannot get involved?
22   A   Do what now?

Page 74

1  A  I can't remember. I know there was a title
2  present. Whether it was my finished title, which I
3  want to say it would have been. Yes, I want to say it
4  would have been.
5  Q  Okay.
6  A  I want to say I would have had a title with
7  my name on it, because I wouldn't have had the old
8  title there if I went to the DMV. I think I would
9  have had, yeah, I think I would have had my title.
10  Q  The very first time you called the police
11  about this trailer, did you tell the police that it
12  was stolen?
13  A  I believe it to be, because like I said, the
14  people that witnessed it leaving knew I couldn't go
15  get it, knew that I bought it, or was buying it, and
16  here it's leaving not by me.
17  Q  I understand that you believed that it was
18  stolen. My question is, did you tell the police that
19  it was stolen?
20  A  I'm sure I might had.
21  Q  Would you have used the word "stolen" to
22  convey that information to the police?

Page 75

1  A  Yeah.
2  Q  And you did speak with the gentleman who had
3  the trailer on the telephone at least once; correct?
4  A  Yes, I think once. Yes, I think it was
5  once.
6  Q  He told you he had the trailer?
7  A  Yes.
8  Q  You told him you had a title to the trailer?
9  A  Um-hum. And then I questioned him briefly
10  why would you buy something for cash, one, and not
11  have anything to validate you buying the trailer? He
12  said he didn't get a title, he didn't get a
13  registration, he didn't get a receipt. He said I gave
14  her $2,200.00 cash. I said well, then, to me you
15  stole it, because nobody does that. You don't give
16  away money for no proof.
17  Q  And he told you he could make a bill of
18  sale?
19  A  That's what he told me on the phone.
20  Q  Do you know whether he did make a bill of
21  sale?
22     MR. IAMELE: Objection.

Page 76

1  A  I don't know.
2  Q  Do you have any recollection of him, that
3  being the person who had the trailer, telling you that
4  he was going to scrap it or destroy it?
5  A  No.
6     MR. CULPEPER: I have no further questions.
7     MR. IAMELE: I don't have any questions.
8     Mr. Bradford, you are not represented in
9  this case. Everything that we have discussed here
10  today is being typed. You are permitted to read the
11  transcript that is produced from this deposition to,
12  one, check for errors in terms of your verbiage, or
13  two, check for factual errors. You are not compelled
14  to do that and you can waive it, if you so choose.
15     THE WITNESS: I think you all know I'm being
16  as honest as I can be here and I have no ill intent,
17  and, like I said, I've got more important things. If
18  the trailer comes about, I still have a legal title
19  and registration for it. If it don't, I'm out
20  $1,500.00 and, you know, whatever. That's the way the
21  law works I guess.
22     MR. CULPEPER: Would you like to waive your

Page 77

1  right to get a copy of this transcript and look for
2  corrections to make?
3     THE WITNESS: I don't think it would hurt to
4  have one. I don't know.
5     MR. IAMELE: It doesn't hurt, but you have
6  to make an election as to whether or not you're going
7  to review it.
8     THE WITNESS: What do you think?
9     MR. CULPEPER: You're looking at me a lot
10  during the course of this deposition. Just for the
11  record --
12     THE WITNESS: I know. You're representing
13  Anne Arundel County and not me.
14     MR. CULPEPER: Right.
15     If you were being deposed as an Anne Arundel
16  County employee, I'm your lawyer, but in this context,
17  I'm not your lawyer.
18     THE WITNESS: I understand.
19     MR. CULPEPER: If you were my client, I
20  would tell you probably that you could waive with this
21  deposition.
22     THE WITNESS: I've never had a deposition,